**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 95-50319**

---

**DONNA PATTERSON; NICHOLAS BROWN,**

**Plaintiffs-Appellees,**

**and**

**MICHAEL L. ADAMS,**

**Plaintiff,**

**VERSUS**

**P.H.P. HEALTHCARE CORPORATION; MARK KENNEDY,**

**Defendants-Appellants.**

---

Appeal from the United States District Court
For the Western District of Texas

---

July 25, 1996

Before DUHÉ, BARKSDALE, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Nicholas Brown, Michael Adams[1] and Donna Patterson brought suit against PHP Healthcare Corporation and Mark Kennedy in state court alleging various employment discrimination and retaliation claims. PHP Healthcare and Kennedy removed the case to federal

---

[1] The district court entered partial summary judgment in this case and ordered that Michael Adams recover nothing from PHP Healthcare and Kennedy. Adams filed no appeal.

court pursuant to 28 U.S.C. § 1441(b). Brown, a black male, alleged that he was constructively discharged from his position as a mental health technician and discriminated against because of his race in violation of 42 U.S.C. § 1981.[2] Patterson, the head nurse at PHP Healthcare's Fort Hood facility, alleged violations of 42 U.S.C. § 2000e-3 for retaliatory discharge based on her opposition to Mark Kennedy's discriminatory hiring practices and Kennedy's discrimination against Brown.[3] After a bench trial, the district court entered judgment in favor of Brown and Patterson and awarded compensatory and punitive damages. For the forthcoming reasons, we affirm in part and reverse in part.

## I.

On July 1, 1991, PHP Healthcare began providing psychiatric services under a fixed price contract for the United States Army personnel at the Darnell Army Community Hospital in Fort Hood, Texas. PHP Healthcare, a private corporation employing more than 500 employees, assembled the following people as the "core" staff

---

[2] Brown and Adams also alleged that PHP Healthcare and Kennedy retaliated against them for engaging in protected speech in violation of 42 U.S.C. § 1983. Brown, Adams and Patterson additionally alleged retaliatory discharge based on reports they made to PHP Healthcare's headquarters concerning fraudulent billing practices. The district court entered partial summary judgment in favor of PHP Healthcare and Kennedy on these claims. No appeal was taken.

[3] The district court dismissed Patterson's state law claims and her Title VII claims against Kennedy on motion for summary judgment. *See* **Grant v. Long Star Co.**, 21 F.3d 649, 651-52 (5th Cir.), *cert. denied*, 115 S. Ct. 574 (1994) (holding that private employees are protected from individual Title VII liability). Patterson did not raise these issues on appeal, and consequently, we do not consider the propriety of the district court's order.

for this new project in Fort Hood: the project manager, Mark Kennedy; the head nurse, Donna Patterson; and the psychologist, Dr. Michael Adams. Donna Hood worked as Kennedy's administrative assistant.

In this two day trial, the district court heard testimony from Kennedy, Patterson, Brown, Dr. Adams and four other witnesses, and determined the validity and credibility of their statements. The district court heard testimony that in late July 1991, less than one month after the facility opened, Kennedy met individually with each of his black employees to discuss a complaint that had been filed with the EEOC. Patterson testified that Kennedy, who is Caucasian, warned his black employees that he would not tolerate any EEOC complaints filed against PHP Healthcare. After the meetings, Kennedy told Patterson that "these stupid niggers need to understand I carry a big stick." At trial, Kennedy could not recall the reason for these meetings and did not refute Patterson's testimony.

Brown and Patterson testified that Kennedy scheduled black mental health technicians almost exclusively to the less desirable night shift. Further, Brown was forced to wait six months before receiving his shift differential upon becoming a full-time employee, while PHP Healthcare promptly resolved a similar problem with a white employee after one month. The district court also heard testimony that a white technician, James Tzcap, received a promotion to mental health technician supervisor while Brown was overlooked for the job.

In March 1992, a meeting was held in which black employees complained about being assigned to the less desirable night shift. Dr. Adams and Patterson testified that, after this meeting, Kennedy told Patterson that "not another nigger is to be hired." The district court also heard testimony from Dr. Adams, Patterson and Janet Berry (a current employee of PHP Healthcare) that Kennedy regularly referred to black employees as "porch monkeys," and "niggers" and considered black employees to be "shiftless" and "lazy." Kennedy did not dispute using the term "porch monkey," however, he testified that he was only joking when he used the term and attributed his use of the term to a joke told by Patterson. He also denied ever referring to his employees as "niggers."

In August 1992, Patterson hired another black mental health technician, Eddie Harris. A few days later, Kennedy left for PHP headquarters for a meeting. When he returned on August 17, 1992, Kennedy fired Patterson. Appellants PHP Healthcare and Kennedy contend that Patterson was fired because she took a three hour lunch while Kennedy was at corporate headquarters. Appellants also argue that Patterson reported for work late on August 10 and that she did not show up for work on August 11. Because of her absence on August 11, a patient escaped from the hospital.

After her termination, Patterson filed a claim with the Texas Employment Commission. Kennedy submitted a document at the T.E.C. hearing which listed PHP Healthcare's reasons for firing Patterson. Kennedy admittedly created this document and back-dated it for use at the T.E.C. hearing. The document included the above details of

**4**

Patterson's alleged inappropriate conduct. PHP Healthcare and Kennedy contend that the document, in concert with Patterson's inability to work constructively with Hood (Kennedy's assistant), her regular tardiness in March, April and May 1992, and Patterson's insubordinate attempts to assist Brown, were valid reasons to terminate her employment.

Patterson never saw this document until the T.E.C. hearings because Kennedy created it expressly for the hearing. Further, one month before her termination, Patterson had received favorable marks in all categories on her employment evaluation. PHP Healthcare's employment manual also required two verbal warnings and a written warning prior to termination. Patterson received no such reprimands.

PHP Healthcare and Kennedy attempted to identify problems with Brown's performance as well. Brown received numerous disciplinary actions, including verbal counseling from Patterson about his tardiness and his tendency to call in sick before and after scheduled days off. Patterson also counseled Brown about agreeing to work for other technicians and then failing to show up. Brown received a written warning about his attendance problems in June 1992 and was placed on probation in July.

However, Kennedy threatened to impose disciplinary action on Brown under highly unusual circumstances involving falsified memos and other documents based on unexcused absences. Brown testified that Kennedy twice threatened him with disciplinary actions based on falsified memos and reports. Patterson corroborated Brown's

testimony and Kennedy did not refute his use of questionable documentation of Brown's conduct. After Patterson was fired, the new head nurse, Becky Simpson, told Brown that she had no interest in hearing from any mental health technician except for the white technician, James Tzcap.

Based on this ongoing array of work related problems, Brown tendered his resignation on September 1, 1992, effective September 4, 1992. On September 1, Brown received a call from John Bucur, a PHP Healthcare official from the corporate headquarters, who arranged a telephone conference with Brown and Kennedy later that afternoon. In this meeting, Brown explained his problems with the work environment. Bucur assured Brown that the work environment would change. Later that afternoon, Brown asked to withdraw his resignation. Kennedy told him that he was no longer needed at PHP Healthcare and that his position had been filled. At the time of trial Kennedy was no longer an employee of PHP Healthcare having been terminated on April 27, 1994. Kennedy was terminated from PHP Healthcare after he gave the primary part of his deposition in this lawsuit.

The district court entered the following findings of fact and conclusions of law in favor of Brown and Patterson: The district court found that Kennedy repeatedly and routinely used racial slurs, including "porch monkey" and "nigger," and used these terms in referring to Brown as well as other black employees. When black employees were terminated or left PHP Healthcare, Kennedy routinely replaced them with white employees.

The district court also found that PHP Healthcare and Kennedy discriminated against Brown on the basis of his race by limiting his work schedule, assigning him certain menial duties that were not performed by white employees, denying him an opportunity for promotion, falsifying documents in order to take disciplinary actions against him, and by constructively terminating him. With respect to Brown's resignation, the district court found that Brown withdrew his resignation in a timely manner after PHP Healthcare's headquarters convinced him that the hostile work environment would be improved. Kennedy then refused to allow Brown to withdraw the resignation which constituted a constructive discharge. Essentially, Brown was retaliated against and terminated for his complaints of racial problems at the hospital. He was replaced by a white employee. The district court found the reasons given by PHP Healthcare and Kennedy for Brown's dismissal to be pretexts for racial discrimination.

The district court entered a final judgment in favor of Brown against PHP Healthcare and Kennedy holding them jointly and severally liable for intentional discrimination in violation of 42 U.S.C. § 1981. The district court awarded damages of $22,648 in lost income and benefits,[4] $40,000 for emotional damage and $150,000 in punitive damages to Brown. The court based its award

---

[4] Brown testified that he worked 50 hours per week for PHP Healthcare. Of those 50 hours, 25 hours were usually from night and weekend shifts which earned an additional eight percent shift differential. Therefore, the district court arrived at $22,648 by calculating (25 hours x $6.19 per hour = $154.75) + (25 hours x $6.69 per hour = $167.25) = $322 weekly wage and factoring on various earnings in mitigation.

of punitive damages on the willful and malicious discrimination evidenced in this case.

As to Patterson, the district court found that she contacted PHP Healthcare's headquarters to call attention to Kennedy's discriminatory actions. In March 1992, after meeting with each black employee about complaints of race discrimination, Kennedy told Patterson that "not another nigger is to be hired." In August 1992, Patterson needed another mental health technician and hired a black employee, Eddie Harris.

Patterson's actions in contacting PHP Healthcare's headquarters and in hiring another black employee were the producing causes of her termination. Kennedy prepared a document setting forth his reasons for terminating Patterson; however, the document was prepared after the termination and back-dated by Kennedy and Dr. Chaparala, the medical director. Kennedy then lied about using the document to terminate Patterson when he testified before the Texas Employment Commission. Based on these facts, the district court found that Patterson was terminated because she hired a black technician in contravention to an illegal directive given to her by Kennedy.

The district court awarded lost income and benefits of $40,000,[5] $150,000 for emotional damage and pain and suffering, and $150,000 in punitive damages against PHP Healthcare based on

---

[5] Patterson testified without dispute that her actual lost wages were in excess of $40,000. She explained that she was a salaried employee of PHP Healthcare and received $36,650 per year or approximately $17.68 per hour.

Patterson's 42 U.S.C. § 2000e-3 claim. The district court further found that both Brown and Patterson were entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.

## II.

Appellants PHP Healthcare and Kennedy raise a number of arguments attacking the district court's legal conclusions based on improper burden shifting and erroneous legal cause findings under *McDonnell Douglas*.[6] PHP Healthcare and Kennedy first argue that the district court erred in finding that Kennedy's racial slurs constituted direct evidence of discrimination. Next, appellants contend that the district court erred in finding a nexus between Patterson's actions opposing Kennedy's discrimination and hiring practices and her termination under 42 U.S.C. § 2000e-3. Third, appellants maintain that the district court failed to specially find facts as required by FED. R. CIV. P. 52(a). Fourth, PHP Healthcare and Kennedy contend that the district court erred in finding that appellants' acts of racial discrimination affected the terms and conditions of Brown's employment in violation of 42 U.S.C. § 1981. Finally, appellants argue that the district court erred in finding that Brown was constructively discharged.

We address these arguments together. After a case has been fully tried on the merits, the *McDonnell Douglas*[7] burden shifting

---

[6] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

[7] In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court set out the burden shifting ritual

analysis ceases to be of import to an appellate court. *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996); *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 118 (5th Cir. 1993). Instead, our inquiry becomes whether the record contains sufficient evidence to support the conclusions reached by the trier of fact. *Haun*, 81 F.3d at 546; *Molnar*, 986 F.2d at 118.

In making this assessment, the district court's factual findings are examined for clear error pursuant to FED. R. CIV. P. 52(a). *See* *EEOC v. Clear Lake Dodge*, 60 F.3d 1146, 1151 (5th Cir. 1995). Under this standard, we reverse a district court's judgment based on erroneous fact findings only when, after weighing the evidence, we are definitely and firmly convinced that a district court made a mistake. *Id.* "Where the court's finding is based on its decision to credit the testimony of one witness over that of another, `that finding, if not internally inconsistent, can virtually never be clear error.'" *Schlesinger v. Heroz*, 2 F.3d 135, 139 (5th Cir. 1993) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)). After a thorough review of the record, we find ample evidence supporting the district court's findings as to liability and, therefore, this case presents no clear error in that regard.

## III.

PHP Healthcare and Kennedy also contend that the district court erred in allowing Brown to amend his pretrial order to raise

_____

used in cases brought under Title VII.

a hostile work environment claim. Brown points out that he received no monetary award for his hostile work environment claim and, in any event, evidence of PHP Healthcare's hostile work environment would have been admitted in support of Brown's intentional race discrimination claim under § 1981.

The Federal Rules of Civil Procedure allow a district court to freely grant leave to amend when justice so requires. FED. R. CIV. P. 15(a). We review the district court's decision to grant or to deny leave to amend for abuse of discretion. ***Engstrom v. First Nat. Bank of Eagle Lake***, 47 F.3d 1459, 1464 (5th Cir.), *cert. denied*, 116 S. Ct. 75 (1995). In this case, permitting Brown's amendment did not surprise, prejudice, or delay the appellants' defense. Brown's 42 U.S.C. § 1981 claim should have alerted PHP Healthcare and Kennedy to the type of evidence that would be elicited in this case. Here, Brown's hostile work environment claim is not so different from his intentional discrimination claim so as to surprise PHP Healthcare or Kennedy and prejudice their defense. Further, the district court did not award damages based on the hostile work environment claim.

PHP Healthcare and Kennedy failed to present evidence demonstrating that the district court's decision to grant Brown's amendment prejudiced their defense of this case. As such, we find no abuse of discretion in the district court's decision to grant leave to amend.

11

PHP Healthcare and Kennedy next challenge the district court's award of back pay and reinstatement to Brown based on evidence of Brown's failure to disclose his prior criminal conviction. The Supreme Court recently set out the applicable standard for determining whether, and to what extent, after-acquired evidence affects a damage award under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* *See McKennon v. Nashville Banner Pub. Co.*, 115 S. Ct. 879 (1995). In *McKennon*, the Court held that evidence of employee wrongdoing after termination does not immunize an employer from liability under Title VII; the wrongdoing, however, may affect the remedy available to the employee. *Id.* at 886-887. In assessing the effect of after-acquired evidence, *McKennon* explains:

> Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.

*Id.* at 886-887; *and see Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1108 (5th Cir. 1995) (citing same).

PHP Healthcare's employment application asked, "[h]ave you ever plead guilty to or been convicted of any criminal offense, excluding minor traffic citations?" Brown answered no. The application also asked whether Brown was currently serving probation or any deferred adjudication for a criminal offense. Again, Brown answered no. PHP Healthcare's Vice President of Human

Resources, John Bucur, testified that a prior conviction would not necessarily bar an applicant from working at PHP Healthcare. Bucur stated, however, that application fraud would result in that employee's immediate dismissal.

Brown admits that he was convicted of burglary in 1982 and sentenced to ten years probation. Brown, however, testified that his probation officer told him that once he completed the probation and paid restitution, his conviction would be expunged. Further, both Patterson and Brown testified that Kennedy knew of Brown's prior conviction when the trio worked together at the Greenleaf Center. The district court made fact findings in support of Brown's testimony. The district court believed Brown's testimony that his probation officer told him that it was unnecessary to notify employers of an expunged conviction. Consequently, the district court found that Brown truthfully completed his employment application. Based on Patterson's and Brown's testimony, the district court also found that PHP Healthcare and Kennedy knew about Brown's prior conviction. Finally, the district court found that PHP Healthcare would not have immediately terminated Brown even if they had not known of the prior conviction. As such, the district court concluded that PHP Healthcare failed to establish that "the wrongdoing was of such severity that [Brown] in fact would have been terminated on those grounds alone if [PHP Healthcare] had known of it at the time of the discharge. *McKennon*, 115 S. Ct. at 886-887.

In determining whether the district court erred in finding

**13**

that Brown would not have been terminated based on his submission of a false employment application, we are again faced with a clear error review which turns on the district court's credibility assessments. After reviewing the record as a whole, including the testimony of Patterson, Brown, Kennedy and Bucur, we defer to the findings of the district court. Even if PHP Healthcare did not have imputed knowledge of Brown's prior conviction, we are not convinced that Brown's failure to include his 10 year-old conviction on his employment application was so severe that PHP Healthcare would have terminated him based on this after-acquired knowledge. The district court's decision to award back pay and reinstatement does not leave us with a firm and definite conviction that a mistake has been made and, as such, we find no clear error.

## V.

Next, PHP Healthcare and Kennedy argue that the district court committed clear error in finding that Patterson and Brown mitigated their damages. *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir.) (*Sellers III*), *cert. denied*, 498 U.S. 987 (1990) (recognizing that successful Title VII claimants have statutory duty under 42 U.S.C. § 2000e-5(g) to mitigate damages). We recognize that no such statutory duty exists to mitigate damages under 42 U.S.C. § 1981. Nevertheless, we are guided by the statutory duty to mitigate damages under § 2000e-5(g) based on the nature of the equitable relief sought by the claimant. *See Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 n.3 (5th Cir. 1980) ("No

**14**

chameleon-like change in the nature of the relief is experienced simply because it is sought under sister provisions in the federal statutes.").

Further, the Supreme Court has recognized that the duty to mitigate damages, "rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 & n.15 (1982) (footnote omitted). Because an award of back pay is an equitable remedy designed to make the injured party whole, we are persuaded that an injured party has a duty under both § 1981 and Title VII to use reasonable diligence to attain substantially similar employment and, thereby, mitigate damages. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 411, 459 (1975) (recognizing that "`the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive.'") (quoting H.R. REP. No. 92-238, at 19 (1971)). As such, we adopt the statutory requirement to exercise reasonable diligence to attain substantially similar employment as a prerequisite to obtaining back pay under § 1981.

In the present case, no party disputes that Brown attained substantially equivalent employment. Instead, PHP Healthcare and Kennedy argue that Brown failed to exercise reasonable diligence to maintain such comparable employment and should not receive back pay for the period after his involuntary termination of the

**15**

substantially similar employment.  We agree.

The Supreme Court requires successful Title VII claimants to use "reasonable diligence" to obtain "substantially equivalent" employment.  *Ford Motor Co.*, 458 U.S. at 232.  The claimant must exercise reasonable diligence in both seeking and maintaining substantially equivalent employment in order to effectuate the reasonable diligence requirement.  *See* ***Brady v. Thurston Motor Lines, Inc.***, 753 F.2d 1269, 1277 (4th Cir. 1985) (holding that forcing the Title VII defendants to pay for the claimant's misconduct in her subsequent employment is not properly related to the objective of the back pay requirements).  Substantially equivalent employment has been defined as "`employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated.'"  ***Sellers III***, 902 F.2d at 1193 (quoting ***Sellers v. Delgado College***, 839 F.2d 1132, 1138 (5th Cir. 1989) (***Sellers II***)).

The Fourth Circuit explained that a Title VII claimant has a duty to exercise reasonable diligence to maintain subsequent employment when that employment is substantially similar to the claimant's prior position.  ***Brady***, 753 F.2d at 1277.  This duty includes an obligation "to make reasonable and good faith efforts to maintain that job once accepted." *Id.*  We find this reasoning persuasive.  By adopting a requirement to use "reasonable and good faith" effort to maintain employment, reasonable diligence becomes

**16**

a two part test.  First, the claimant must exercise reasonable diligence in obtaining substantially similar employment.  *Ford Motor Co.*, 458 U.S. at 232; *and see Sellers III*, 902 F.2d at 1193.  Second, in order to give effect to the statutory requirement to use reasonable diligence, it necessarily follows that the claimant must also use reasonable diligence in maintaining that substantially similar employment.  *Brady*, 753 F.2d at 1277.

In this case, the district court found that Brown was constructively terminated from PHP Healthcare on September 1, 1992.  Brown began working for Metroplex, another mental Healthcare provider, on September 8, 1992.  Brown was then terminated from Metroplex on April 14, 1993.  Kim Henry, the director of nursing at Metroplex, testified that Brown was fired for excessive absences, making personal phone calls and for his conflicts with another staff member.  Brown concedes that he was involuntarily terminated from his job as a mental health technician for Metroplex.

We review the district court's determination of whether a claimant used reasonable diligence in attaining and maintaining substantially similar employment as a finding of fact subject to reversal for clear error.  FED. R. CIV. P. 52(a); *Rhodes v. Guiberson Oil Tools*, 82 F.3d 615, 621 (5th Cir. 1996) (en banc).  As such, if the district court's findings are plausible in light of the evidence presented, we may not reverse its decision even if we

would have reached a different conclusion. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

Here, the district court's damage award included back pay[8] from the date Brown was terminated from Metroplex, April 14, 1993, through December 1993.[9]  While we recognize the remedial purposes of this statute generally permit back pay relief in all but "special circumstances," this case present such a circumstance.[10] Brown was directly responsible for his loss of employment with Metroplex.  The record indicates that Brown was fired from Metroplex on April 14, 1993, because of excessive absences, excessive use of the company phone for personal phone calls and for

---

[8]  "Back pay" commonly refers to the wages and other benefits that an employee would have earned if the unlawful event that affected the employee's job related compensation had not occurred. *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941). On the other hand, "front pay" is an equitable remedy referring to future lost earnings.  Front pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages. *See* J. Hardin Marion, *Legal and Equitable Remedies Under the Age Discrimination in Employment Act*, 45 MD. L. REV. 298, 330-334 (1986).

[9]  When calculating back pay damages, 42 U.S.C. § 2000e-5(g)(1) (1994) provides in pertinent part:

> If the court finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate. *Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission.*  Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

(Emphasis added).

[10]  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415 (1975) (recognizing that the statutory requirement to award back pay does not automatically attach in all circumstances).

his conflicts with another staff member. Brown presented no evidence disputing the reasons given for his termination. Consequently, we hold that the district court's back pay assessment was clearly erroneous. We hold that a § 1981 claimant who attains employment substantially equivalent to the employment from which the claimant was unlawfully discharged has a duty "to make reasonable and good faith efforts to maintain that job once accepted." *Brady*, 753 F.2d at 1277. Brown breached this duty by acting in such a manner that caused his involuntary termination from Metroplex. By failing to make a reasonable and good faith effort to keep his job at Metroplex, Brown effectively removed himself from the job market for purposes of receiving back pay. *See id.; Ford Motor Co.*, 458 U.S. at 231-232. Therefore, we vacate the district court's back pay award to Brown with respect to the period after his involuntary termination and remand for a new damage determination in light of our decision.

PHP Healthcare and Kennedy raise a similar argument contending that back pay was improperly awarded to Patterson under Title VII. To meet their burden of showing Patterson failed to mitigate her damages, PHP Healthcare and Kennedy must show that substantially equivalent work was available and that Patterson did not exercise reasonable diligence in attaining that employment. *See Sellers III*, 902 F.2d at 1193. After reviewing the record, we hold that the district court committed no clear error in finding that Patterson made a reasonable effort to mitigate her damages.

Upon her discharge from PHP Healthcare, Patterson did take a

**20**

job at Metroplex, but it was only part-time and lasted one month. Thereafter, Patterson testified that she attempted to attain employment but was unsuccessful. She finally got a job at the Huntsville prison working with psychiatric prisoners. Patterson testified that she worked in Huntsville for three months and then transferred to the Houston unit. Patterson worked in Houston for over one year before quitting and moving back to Gatesville, Texas, to live with her family. PHP Healthcare and Kennedy offered no evidence to show that substantially equivalent work was available nor did they show that Patterson failed to use reasonable diligence to attain substantially similar employment. Further, Patterson voluntarily resigned from her post-PHP Healthcare jobs. Unlike Brown, no evidence exists to show that Patterson breached her duty to mitigate damages. Therefore, we hold that the district court committed no clear error with respect to Patterson's back pay award.

## VI.

Next, PHP Healthcare and Kennedy argue that the district court committed clear error in awarding $40,000 to Brown under 42 U.S.C. § 1981 and $150,000 to Patterson under Title VII for emotional damage and mental pain and suffering.

*A. Section 1981 – Emotional Harm.*

We have recognized that emotional harm may be recoverable under § 1981. ***Gore v. Turner***, 563 F.2d 159, 164 (5th Cir. 1977); *and see **Johnson***, 421 U.S. at 460, 95 S. Ct. at 1720. Our standard

**21**

of review for awards based on intangible harms such as mental anguish is deferential to the fact finder because "the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." 1 HENRY H. PERRITT, JR., CIVIL RIGHTS IN THE WORKPLACE § 4.6, at 245 (2d ed. 1995); *see also* **Thompson v. San Antonio Retail Ass'n**, 682 F.2d 509, 513 (5th Cir. 1982).

Although we generally defer to the fact finder in determining intangible harms, an award is warranted only when a sufficient causal connection exists between the statutory violation and the alleged injury. **Gore**, 563 F.2d at 164. The Supreme Court has also required that compensatory damages such as emotional harm caused by the deprivation of constitutional rights may be awarded only when claimants submit proof of actual injury.[11] **Carey v. Piphus**, 435 U.S. 247, 255-56, 98 S. Ct. 1042, 1048 (1978). Therefore, a claimant must present testimony and/or other evidence to show the nature and extent of emotional harm caused by the alleged violation. In **Carey**, the Court stated:

> We use the term "distress" to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an *award of damages must be supported by competent evidence concerning the injury.*

_____

[11] We have noted that while **Carey** refers to damage awards under 42 U.S.C. § 1983, "it is clear from the opinion as a whole that the Court's reasoning was not confined to § 1983." **Johnson v. IRS**, 700 F.2d 971, 977 n.11 (5th Cir. 1983). As a result, we apply the reasoning of **Carey** to cases involving federal claims for emotional harm.

*Carey*, 435 U.S. at 264 n.20, 98 S. Ct. at 1052 n.20 (emphasis added). A number of our sister circuits have recognized that a claimant's testimony alone may not be sufficient to support anything more than a nominal damage award. *See Fitzgerald v. Mountain States Telephone and Telegraph Co.*, 68 F.3d 1257, 1265 (10th Cir. 1995) (remanding an emotional damage award of $250,000 per plaintiff as clearly excessive when the award was based solely on the testimony of the plaintiffs; no physicians or psychologists testified and plaintiffs continued to work in their chosen fields.); *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988), *cert. denied*, 492 U.S. 905 (1989) (reversing a § 1981 emotional distress award for $15,000 based on the lack of evidence to support such an award); *Erebia v. Crysler Plastic Prod. Corp.*, 772 F.2d 1250, 1259 (6th Cir. 1985), *cert. denied*, 475 U.S. 1015 (1986) (reversing a § 1981 emotional damage award of $10,000 and remanding with instructions to award nominal damages because plaintiff offered only his own testimony); *Vance v. Southern Bell Telephone and Telegraph Co.*, 863 F.2d 1503, (11th Cir. 1989), *cert. denied*, 115 S. Ct. 1110 (1995) (affirming the district court's finding that the jury's award of $500,000 for emotional distress was grossly excessive when based solely on plaintiff's testimony that her hostile work environment caused her mental distress).

In many instances, corroborating testimony and evidence of medical or psychological treatment have been relied upon to support an award of emotional harm or mental anguish. See *Rowlett v. Anheuser-Busch*, 832 F.2d 194, 204-05 (1st Cir. 1987) (affirming §

1981 emotional damage award of $123,000 based on plaintiff's testimony and testimony from psychiatrist); **Cowan v. Prudential Ins. Co. of America**, 852 F.2d 688, 690-91 (2d Cir. 1988) (affirming § 1981 emotional damage award of $15,000 based on testimony of plaintiff, his wife and co-workers about the stress, humiliation and emotional distress suffered); **Wilmington v. J.I. Case Co.**, 793 F.2d 909, 922 (8th Cir. 1986) (affirming § 1981 damage award of based on testimony of plaintiff and other witnesses). For example, in **Rowlett v. Anheuser-Busch, Inc.**, the First Circuit affirmed an emotional distress award of $123,000 to a black employee under § 1981 based on plaintiff's testimony that he was under continuous stress over a seven year period, he never received the proper training promised by management, he feared that he would make a mistake and be discharged because of his lack of training, and, after his discharge, he was unemployed and suffered emotional problems. **Rowlett**, 832 F.2d at 204-205. Rowlett also presented expert testimony of a psychiatrist who explained that he suffered from symptoms of anxiety, stress, and some depression for which he was treated with an antidepressant. **Id.** at 204. The court then held that "Rowlett's testimony, in combination with that of the psychiatrist and with the jury's common sense judgment of the emotional complications that would accompany the intentional discrimination Rowlett suffered, provides an adequate basis for the portion of the compensatory damage award attributable to emotional distress." **Id.**

The EEOC, as the primary enforcement mechanism against

discrimination under Title VII, apparently recognized this trend in case law and interpreted the 1991 Amendments allowing compensatory damages under Title VII to similarly require physical manifestations to recover for emotional harm. EEOC POLICY GUIDANCE No. 915.002 § II(A)(2), at 10 (July 14, 1992). The Commission's position statement noted that "[c]ases awarding compensatory and punitive damages under other civil rights statutes will be used as guidance in analyzing the availability of damages under § 1981a. Section 1981 cases are particularly useful because Congress treated the § 1981a damage provisions as an amendment to § 1981." *Id.* at 10 n.13. The Commission then explained its position on the availability of intangible injury under § 1981a as follows:

> Damages are available for the intangible injuries of emotional harm such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. Other nonpecuniary losses could include injury to professional standing, injury to character and reputation, injury to credit standing, loss of health, and any other nonpecuniary losses that are incurred as a result of the discriminatory conduct. Nonpecuniary losses for emotional harm are more difficult to prove than pecuniary losses. *Emotional harm will not be presumed simply because the complaining party is a victim of discrimination.[] The existence, nature, and severity of emotional harm must be proved*. Emotional harm may manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive
fatigue, or a nervous breakdown. Physical manifestations of emotional harm may consist of ulcers, gastrointestinal disorders, hair loss, or headaches. . . . The Commission will typically require medical evidence of emotional harm to seek damages for such harm in conciliation negotiations.

*Id.* at 10-12 (footnotes omitted) (emphasis added).

In the instant case, the district court awarded $40,000 for

25

emotional distress to Brown based solely on his testimony and the discriminatory conduct forming the basis of this lawsuit. Brown testified that he felt "frustrated" and "real bad" for being judged by the color of his skin. Brown explained that the work environment was "unbearable" and was "tearing my self-esteem down." Brown also stated that it "hurt" and made him "angry" and "paranoid" to know that his supervisor referred to Brown as a "porch monkey" or a "nigger" and generally thought that he was inferior to white employees. This testimony is the only evidence submitted by Brown in support of his emotional distress claim.

After a complete review of the record, we hold that Brown's testimony of mental distress is insufficient to support anything more than a nominal damage award. While the district court could infer that being referred to as a "porch monkey" and a "nigger" would cause one emotional distress, Brown has not presented evidence with the specificity required by *Carey* nor has Brown testified as to any manifestations of harm listed by the EEOC policy statement. *See* EEOC POLICY GUIDANCE NO. 915.002 § II(A)(2), at 10-11. Brown presented no corroborating testimony nor did he offer expert medical or psychological evidence of damages caused by his alleged distress. No evidence suggests that Brown suffered from sleeplessness, anxiety or depression. Furthermore, immediately after his constructive discharge from PHP Healthcare, Brown obtained employment at Metroplex for a higher hourly wage rate than he received at PHP Healthcare.

In order to establish intangible loss, we recognize that *Carey*

requires a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award. *Carey*, 435 U.S. at 264, 98 S. Ct. at 1052. Hurt feelings, anger and frustration are part of life. Unless the cause of action manifests some specific discernable injury to the claimant's emotional state, we cannot say that the specificity requirement of *Carey* has been satisfied. We find no support for the district court's emotional damage award in this record. Consequently, based on the above reasoning, we hold that the district court abused its discretion in awarding emotional distress damages to Brown on his § 1981 claim. We vacate the district court's $40,000 emotional distress award as to Brown and remand the case with instructions for the district court to award nominal damages.

*B. Title VII - Emotional Harm*

For purposes of Title VII, § 102 of the Civil Rights Act of 1991 significantly expanded the available remedies for plaintiffs subjected to discrimination under Title VII. 42 U.S.C. § 1981a; *and see* **Landgraf v. USI Film Products**, 114 S. Ct. 1483, 1490-1491 (1994). Under this section, "a Title VII plaintiff who wins a back pay award may also seek compensatory damages for `future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" **Landgraf**, 114 S. Ct. at 1491 (quoting 42 U.S.C. § 1981a(b)(3)). As such, both § 1981 and Title VII permit awards for intangible loss

such as mental anguish or emotional distress.

Nothing in the 1991 Amendments to Title VII suggests that we should analyze claims for emotional distress under Title VII using different guidelines than those explained above for § 1981 emotional distress claims.[12]  Furthermore, Congress treated the § 1981a compensatory and punitive damage provisions as amendments to § 1981.  The legislative history of the 1991 Amendments to Title VII also shows that Congress sought to unify the law for employment discrimination cases.  H.R. REP. NO. 102-40 (II), 102d Cong., 1st Sess. at 24 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 717.  As such, we see no reason to frustrate Congressional intent by fashioning different rules for § 1981 and Title VII claims.  Consequently, we read **Carey** to require a plaintiff to present the same level of competent evidence under a Title VII emotional distress claim as is required to sustain a finding for emotional distress under §§ 1981 and 1983.  **Carey**, 435 U.S. at 255-56, 98 S. Ct. at 1048.

We again review the district court's emotional damage award for abuse of discretion.  The district court awarded Patterson $150,000 for emotional damage, and mental pain and suffering.  Again, no testimony was presented to show any manifestations of harm listed by the EEOC policy statement.  Patterson presented no evidence that she was subjected to sexist or racist comments nor did she testify that she was subjected to a hostile work

_____

[12]  We also recognize that nothing in the statute suggests that the same standards apply.

environment. Instead, Patterson testified that she was terminated by Kennedy for insubordination for hiring another black employee. She also explained that Kennedy created and back-dated a document for use at her T.E.C. hearings in order to challenge her application for unemployment. Patterson also testified that her retaliatory firing emotionally scarred her and resulted in unemployment for almost one year. Patterson explained that she worked in a narrow field as a psychiatric nurse and could not easily attain employment due to the limited number of facilities.

Apparently, the district court based its emotional harm award on testimony that Patterson suffered mental anguish during her unemployment, that she endured a great deal of familial discord arising from her acceptance of other jobs in Huntsville and Houston because she was forced to leave her children in the Gatesville area, and that the firing and subsequent moves to Huntsville and Houston to obtain work caused mental distress because she was separated from her children. Obviously, the retaliatory discharge caused a substantial disruption in Patterson's daily routine. However, this record is void of sufficient competent evidence to support anything more than nominal damages under *Carey*. *Carey*, 435 U.S. at 255-56, 98 S. Ct. at 1048.

The record contains none of the listed evidentiary factors in the EEOC policy statement. *See* EEOC POLICY GUIDANCE NO. 915.002 at 10-11. No corroborating testimony was offered to support Patterson's testimony. No evidence suggests that Patterson was

humiliated or subjected to any kind of hostile work environment. Further, no expert medical or psychological evidence exists to support a claim for emotional harm. No proof of actual injury exists in this case. Because Patterson failed to present sufficient competent testimony and/or other evidence to demonstrate the nature and extent of emotional harm caused by her unlawful termination, we hold that the district court abused its discretion in awarding her $150,000 for emotional distress. As we explained above, *Carey* teaches us that the an award of damages for "distress" "*must be supported by competent evidence concerning the injury.*" *Carey*, 435 U.S. at 264 n.20, 98 S. Ct. at 1052 n.20 (emphasis added). Patterson's testimony alone does not meet this threshold. We therefore vacate the district court's Title VII emotional distress award and remand to the district court with instructions to award nominal damages for Patterson's emotional distress.

## VII.

Appellants PHP Healthcare and Kennedy also argue that the district court committed clear error by awarding punitive damages to Brown under 42 U.S.C. § 1981 and to Patterson under 42 U.S.C. § 1981a. A party who establishes a cause of action under 42 U.S.C. § 1981 may be entitled to punitive damages "under certain circumstances." *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S. Ct. 1716, 1720 (1975). The general rule in this circuit permits a punitive damage award against a § 1981 defendant when the defendant acts willfully or with gross disregard for the

30

plaintiff's rights. *See Jones v. Western Geophysical Co.*, 761 F.2d 1158, 1162 (5th Cir. 1985).[13] In *Jones*, we also recognized this characterization to be one of malice. *Id.* (citing *Clairborne v. Illinois Central R.R.*, 583 F.2d 143, 154 (5th Cir. 1978), *cert. denied*, 442 U.S. 934 (1979)).

Punitive damages were unavailable to Title VII plaintiffs until the enactment of the 1991 Amendments to the Civil Rights Act of 1964, 42 U.S.C. § 1981a. Congress's primary concern with enacting punitive damages under § 1981a(b)(1) was to unify the law under Title VII. H.R. REP. NO. 102-40 (II), 102d Cong., 1st Sess. at 24-29 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 717-723. In furtherance of this unification effort, Congress permitted the imposition of punitive damages under Title VII in the same general circumstances as punitive damage awards imposed by courts under § 1981. *Id.; and see* H.R. REP. NO. 40(I), 102d Cong., 1st Sess. at 74 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 612. Section 1981a provides that, for a district court to award punitive damages under Title VII, the complaining party must show "that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "Punitive damages are available under [§ 1981a] to

_____

[13] The Supreme Court fashioned a similar standard for assessing punitive damages under § 1983. *Smith v. Wade*, 461 U.S. 30, 51, 103 S. Ct. 1625, 1637 (1983). In *Wade*, the Court held that punitive damages may be assessed under § 1983 when the defendant commits acts intentionally or with reckless or callous disregard for the plaintiff's rights. *Wade*, 461 U.S. at 51, 103 S. Ct. at 1637.

31

the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981.  No higher standard may be imposed."  137 CONG. REC. H9527 (daily ed. Nov. 7, 1991) (Rep. Edwards' Interpretive Memorandum).

From our reading of the legislative history to the 1991 Amendments to Title VII, we can conclude that Congress intended these amendments to unify the law for employment discrimination cases.  Accordingly, we shall consider the propriety of punitive damage awards under §§ 1981 and 1981a under the same criteria.

It is well settled that a private employer may be held liable for punitive damages in employment discrimination cases under § 1981 based on the acts of supervisory employees.[14] *Flanagan v. A.E. Henry Com. Health Serv. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).  Title VII, however, only provides for "employer" liability.  42 U.S.C. § 2000e-2.  Although individuals may not be held liable under Title VII unless they meet § 2000e(b) definition of "employer," an individual employee's actions may subject the employer to liability under agency principles.  *See* *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir.), *cert. denied*, 115 S. Ct. 574 (1994) (noting that "the purpose of the `agent' provision in § 2000e(b) was to incorporate respondeat superior liability into Title VII.").  The Supreme Court has also held that employers are

_____

[14]  In *Flanagan*, we affirmed a district court's application of agency principles to extend liability under § 1981 to a private employer.  *Id.* at 1236.  We held that "in cases . . . where a clear agency relationship exists between the employer and supervisors with control over the operations of the employer and the employment status of the plaintiff, liability may be appropriately extended against the employer."  *Id.*

not strictly liable under Title VII for the discriminatory acts of their agents. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72, 106 S. Ct. 2399, 2408 (1986). As such, agency principles apply under Title VII and should necessarily be extended to the remedies made available under the 1991 Amendments, 42 U.S.C. § 1981a.

For punitive damages to be assessed under § 1981 or § 1983, the defendant must have committed acts with malice or reckless indifference to the federally protected rights of the plaintiff. *Jones*, 761 F.2d at 1162; 42 U.S.C. § 1981a(b)(1). We review the propriety of the district court's punitive damage award for abuse of discretion. *Id.*

In the case *sub judice*, the district court found that Brown and Patterson were subjected to willful and malicious discrimination and awarded Brown and Patterson $150,000 each in punitive damages. Kennedy was the project manager and supervisor for PHP Healthcare's Fort Hood Facility. The record shows that Kennedy intentionally discriminated against Brown and Patterson. The record is replete with Kennedy's use of racial epithets and other actions demonstrating his reprehensible views on race relations. Evidence shows that Brown was scheduled to the less desirable night shifts and assigned menial tasks which white employees were not required to perform. The district court also found that PHP Healthcare and Kennedy discriminated against Brown on the basis of his race with respect to the assignment of benefits and disciplinary actions taken by the company.

The district court further found that Kennedy told Patterson

33

"not another nigger is to be hired." A few days after Patterson hired another black employee, she was terminated. The court further found that Patterson's attempt to contact PHP Healthcare's headquarters in an effort to stop the ongoing discrimination at the Fort Hood facility was another producing cause of her termination. After her termination, Kennedy created and back dated a document for use at Patterson's T.E.C. hearing detailing alleged misconduct. This report stated that, while Kennedy was at PHP Healthcare's headquarters in Washington, D.C., Patterson took a three hour lunch, she failed to report to work on another day, and she was absent from work when a patient escaped. Kennedy then lied about using this document to fire Patterson when he testified before the T.E.C. Based on the evidence presented, the district court found that Patterson was, in fact, fired soon after disobeying Kennedy's directive "not to hire any more niggers," while Brown was constructively discharged after he was assured that the racially hostile work environment at PHP Healthcare would change.

The district court found that these facts, taken together, showed Kennedy's malice and/or reckless indifference to the federally protected rights of Brown and Patterson and awarded punitive damages. *See* 42 U.S.C. § 1981a(b)(1). Under § 1981, the district court found Kennedy and PHP Healthcare jointly and severally liable to Brown for $150,000. Under Title VII, the district court found PHP Healthcare liable to Patterson for $150,000 as an "employer" under the terms of the statute.

Based on the record presented, we cannot say that the district

34

court abused its discretion in assessing punitive damages against Kennedy. Kennedy's actions in falsifying documents to establish a paper trail of misconduct for Brown coupled with his racial animosity support a determination of malicious or reckless conduct justifying punitive damages.

However, the quantum of this award does not comply with the three factors set out by the Supreme Court to determine the reasonableness of a punitive damage award. *See* ***BMW of North America, Inc. v. Gore***, 116 S. Ct. 1589, 1598-99 (1996). We understand that ***BMW*** deals with constitutional limits on punitive damages, but we find it instructive here. In ***BMW***, the Court held that the following factors must be considered in determining whether a punitive damage award was reasonable: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm suffered and the damage award; and (3) the difference between the damages awarded in this case and comparable cases. ***Id.*** An award of $150,000 fails to meet any of these three factors.

First, Brown was not personally subjected to verbal or physical abuse and no evidence suggests that Kennedy's actions reflected a prevailing attitude of PHP Healthcare to warrant such a large punitive assessment. In a close case such as this one, Kennedy's intentional falsification of documents is the only finding made by the district court which meets the malicious or reckless indifference requirement for imposing punitive damages. Next, the punitive damage assessment bears no "reasonable

35

relationship" to the compensatory damage awards in this case. On remand, Brown's back-pay and lost benefits award will be substantially reduced from $22,648. Further, only nominal emotional damage are warranted in this case. Even if we based the punitive award on the original back-pay and benefits award of $22,648 the ratio of punitives to compensatory damages would be approximately 6.5 to 1. The Supreme Court has recognized a punitive damage award of 4 times the amount of compensatory damages to be "close to the line" in terms of constitutional propriety. *BMW*, 106 S. Ct. at 1602 (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 1046 (1991)). Finally, the largest punitive damage award under § 1981 in this circuit, of which we are aware to date, is $50,000. *See Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986), *aff'd in part and remanded in part*, 109 S. Ct. 2702 (1989). For these reasons, we vacate the punitive damage award in favor of Brown against Kennedy and remand for reassessment in light of this opinion.

As to the punitive damage assessments against PHP Healthcare under § 1981 and Title VII, we again recognize that "the trier of fact's decision whether to award [punitives] damages is discretionary." *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994). However, we find no evidence in this record to support the district court's punitive damage assessment as to PHP Healthcare under either § 1981 or § 1981a.

The Supreme Court has held that § 1981 liability reaches only intentional discrimination, *General Bldg. Contractors Ass'n v.*

36

*Pennsylvania*, 458 U.S. 375, 389-91, 102 S. Ct. 3141, 3149-50 (1982). The Court has also held that employers are not strictly liable for the acts of their employee. *Vinson*, 477 U.S. at 72, 106 S. Ct. at 2408. Agency principles apply to § 1981 (and to Title VII) to hold an employer liable "for those intentional wrongs of his employees that are committed in furtherance of the employment; the tortfeasing employee must think (however misguidedly) that he is doing the employer's business in committing the wrong." *General Bldg. Contractors*, 458 U.S. at 392, 102 S. Ct. at 3150-51. We agree that Kennedy's actions may be attributed to PHP Healthcare for purposes of compensatory damages, given his supervisory role as project manager.

However, the imposition of punitive damages under § 1981 and Title VII requires that the discrimination be malicious or done with reckless indifference. *Jones*, 761 F.2d at 1162; *and see* 42 U.S.C § 1981a. All of the discriminatory acts in this case were solely acts of Kennedy. Kennedy was not a corporate officer of PHP Healthcare but was the "project manager" of the Fort Hood office. PHP Healthcare provided a handbook which expressly established a policy of non-discrimination and explained how employees could complain about discriminatory practices to the company. Further, the vice president of human resources, John Bucur, testified that memos were distributed throughout the Fort Hood facility which also set out the procedures for making complaints to headquarters. No evidence suggests that Brown or Patterson followed these procedures in an attempt to notify PHP Healthcare's corporate office that

37

Kennedy was discriminating against black employees. The record is completely void of evidence showing that PHP Healthcare took part in any discriminatory conduct much less any "malicious" or "reckless" conduct. The existence of the employment handbook setting forth a policy of non-discrimination is at least prima facie evidence of awareness on the part of PHP Healthcare of the federally protected rights of Brown and Patterson; and there is nothing in this record which purports to show that PHP Healthcare took any action which was inconsistent with that policy. Similarly, there is nothing in the record which would show that PHP Healthcare had knowledge of Kennedy's malicious or reckless conduct, or authorized, ratified, or approved Kennedy's actions. *See* **Fitzgerald**, 68 F.3d at 1263 (refusing to impose punitive damages under § 1981 where employer took no part in the intentional discrimination). Although Kennedy was the project manager of PHP Healthcare's Fort Hood facility, his actions alone, without some evidence showing that PHP Healthcare knew or should have known of Kennedy's malicious or reckless conduct, are insufficient to cause punitive liability to directly attach to PHP Healthcare.[15]

For these reasons, we hold that the district court abused its

---

[15] We have affirmed a district court's refusal to impose punitive damages based on evidence that a defendant had taken steps to eliminate racial discrimination and the ambiguous nature of the evidence at the district court level. **Jones v. Western Geophysical Co.**, 761 F.2d at 1162. When prompt remedial measures were taken by the employer, the evidence "did not compel the conclusion the [defendant] had behaved maliciously." *Id.* at 1162. Similarly, the evidence in this case does not compel the conclusion that PHP Healthcare behaved in a manner which warranted the imposition of punitive damages.

discretion in awarding punitive damages against PHP Healthcare in this case. Therefore, we vacate the district court's punitive damage award in favor of Brown and remand for reassessment against Kennedy under § 1981 in his individual capacity. We reverse Patterson's punitive damage award under Title VII because no individual liability attaches under this statute. *See* **Grant**, 21 F.3d at 651.

## VIII.

PHP Healthcare and Kennedy further contend that the district court erred computing attorneys' fees in this case. When Brown and Patterson originally filed this suit on May 28, 1993, they were represented by the law firm of Salter and Thetford. Salter and Thetford withdrew as counsel on July 25, 1994. Brown retained David J. Guillory, David Weiser and Bill Bingham while Patterson hired W.V. Dunnam, Jr., as counsel. Brown then amended his complaint to add violations of 42 U.S.C. §§ 1981 and 1983. Patterson also filed an amended complaint adding intentional infliction of emotional distress. All claims except for Brown's § 1981 claim and Patterson's Title VII claim were dismissed at the summary judgment stage.

PHP Healthcare and Kennedy contend that the district court erred in awarding $22,500 in attorney's fees to Brown and Patterson for the time spent by the law firm of Salter & Thetford. Appellants also maintain that the $45,000 in attorney's fees awarded to Brown should have been reduced by the amount of hours

spent on claims unrelated to the successful claims. We review a district court's award of attorney's fees for abuse of discretion. *Cooper v. Pentecost*, 77 F.3d 829, 831 (5th Cir. 1996).

Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Section 1988 authorizes district courts to award reasonable attorney's fees to prevailing parties in civil rights cases. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). In *Hensley*, the Supreme Court offered guidance for determining a proper award of attorney's fees in cases in which the plaintiffs brought a number of causes of action but prevailed on only a few or, in this case, one:

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.

*Id.* at 435.

Here, the district court properly followed the teachings of *Hensley* and reduced the attorney's fees award claimed by Guillory, Weiser and Bingham and further adjusted Salter and Thetford's stated hours. The district court also applied the *Johnson* factors.[16] *See Cooper*, 77 F.3d at 831 (recognizing that the district court must examine the factors set out in *Johnson*). Per *Johnson,* the district court examined the novelty and difficulty of the case, the requisite skill required to perform legal services,

---

[16] *Johnson v. Georgia Hwy Express*, 488 F.2d 714, 717-719 (5th Cir. 1974).

40

the preclusion of other employment, customary fees, amounts involved and results obtained; the desirability of the case, the nature and length of the professional relationship awards in similar cases, and the time and labor required. **Johnson**, 488 F.2d at 717-719.

Based on the district court's **Johnson** factor analysis and the findings presented, we find no abuse of discretion with respect to the district court's attorneys' fee award of $68,898.84 to Brown and $36,000 to Patterson.

**IX.**

In summary, we affirm the district court's judgment against PHP Healthcare for back pay on Patterson's claim of retaliatory discharge under 42 U.S.C. § 2000e-3. We also affirm the district court's judgment of liability against PHP Healthcare and Kennedy for back pay on Brown's claim of race discrimination under 42 U.S.C. § 1981. However, because of his failure to exercise reasonable diligence to maintain substantially similar employment and mitigate his damages, we vacate the district court's back pay award as to Brown and remand that award to the district court for redetermination. The district court is instructed to reduce Brown's back pay award by excluding all back pay from the date of his involuntary termination from Metroplex forward.

We vacate the awards of emotional damages as to both Brown and Patterson and remand such awards to the district court with instructions to assess nominal damages for such claims. We also vacate the district court's award of punitive damage as to Brown

41

and remand that award to the district court to reassess the award consistent with the instructions herein and to assess such award against Kennedy in his individual capacity.  As to Patterson, we reverse the punitive damage award in its entirety and render judgment that no punitive damages are recoverable by Patterson against PHP Healthcare in this case.  We affirm the awards of attorneys' fees in this case.