IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 6, 2007**

Charles R. Fulbruge III
Clerk

No. 05-10576

Jimmy Palasota,

Plaintiff-Appellee and Cross-Appellant

v.

Haggar Clothing Co.,

Defendant-Appellant and Cross-Appellee

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

DENNIS, Circuit Judge:

This is the second round of appeals in this Age Discrimination in Employment Act ("ADEA") case. 29 U.S.C. § 621 et seq. In the first appeal, this court's panel reversed the district court's judgment as a matter of law ("JMOL") for the Defendant, Haggar Clothing Co. ("Haggar"), reinstated the jury verdict in favor of Plaintiff, Jimmy Palasota ("Palasota"), and remanded for decision of pretermitted issues. Palasota v. Haggar Clothing Co., 342 F.3d 569 (5th Cir. 2003) ("Palasota I").  On remand, the district court denied Haggar's amended motion for JMOL and upheld the jury verdict awarding Mr. Palasota $842,218.96 in back pay and $842,218.96 in liquidated damages. Additionally, the district court awarded Mr. Palasota equitable remedies of lump sum front

pay of $524,999.98, reinstatement of Mr. Palasota to Haggar's first available sales associate vacancy in the Dallas area, and interim front pay of $14,583.33 per month commencing on the date of entry of the judgment and continuing until Mr. Palasota is reinstated, as well as post-judgment interest and costs of court. Palasota v. Haggar Clothing Co., No. 3:00-CV-1925-G, 2005 WL 221221 at *5 (N.D. Tex., Jan. 28, 2005) ("Palasota Remand"). Both parties appealed.

We now affirm the district court's judgment denying Haggar's amended motion for JMOL, awarding Palasota back pay and liquidated damages based on the jury verdict, and awarding Palasota post-judgment interest, and costs of court. We reverse and render judgment in favor of Haggar, rejecting Palasota's claims for reinstatement and interim monthly front pay. We vacate and remand for further proceedings with respect to Palasota's claim for lump sum front pay.

I.

Jimmy Palasota worked for Haggar as a men's clothing sales associate for 28 years, until May 10, 1996, when, at the age of 51, he was terminated. Over his years of service, he was referred to as an "outstanding" employee, and performed his work exceptionally well. In 1995 his accounts netted him an annual income of $175,000. His territory at that time included a key account with Dillard's, some trade accounts,[1] and eight Dallas/Ft. Worth-area J.C. Penney stores.

During the 1990s, as the clothing industry was restructuring, Haggar overhauled its company image, in part by replacing older sales associates with younger individuals. Haggar also changed its compensation plan in the early 1990s, paying associates a guaranteed monthly income based on the prior year's

---

[1] "A key account is a high volume sales account that Haggar assigns only to its best Sales Associates. Unlike a high-volume key account, a trade account territory is made up of numerous lower-volume stores." Palasota I, 342 F.3d at 571 & n.1.

sales. In the fall of 1995, however, Haggar resumed paying its associates on a straight commission basis without any guarantee.

In 1995, through no fault of Palasota, Haggar lost its account with Dillard's Department Stores, which had generated around 85% of Palasota's income (between $148,750 and $157,500 per year). Haggar's manager over Palasota proposed assigning him a new sales territory including 51 additional J.C. Penney stores in Houston, San Antonio, and Austin, which would have allowed him to maintain his earnings at the same level. In December 1995, however, Haggar replaced that manager, and Palasota's new manager refused to assign the proposed territory to Palasota. Instead, Palasota was relegated to less lucrative accounts in East Texas and Louisiana. That assignment allowed him to earn no more than $85,600 per year.

Moreover, in February 1996, the new manager informed Mr. Palasota that he could accept either the less lucrative territory or a severance package. Mr. Palasota declined the severance package and refused to resign. As a part of the transition to the less profitable territory, Haggar provided Mr. Palasota with a salary bridge, effective from January through April of 1996, that guaranteed him 80% of his 1995 salary (about $139,860).

In March, 1996, Mr. Palasota's manager informed him that he would be terminated. On April 29, 1996, Haggar notified Mr. Palasota in writing of his pending termination. The termination notice included the tender of a severance package of 12 months' pay and a requirement that he release Haggar from liability to him for his ADEA claims. Mr. Palasota did not accept the severance package and was officially terminated on May 10, 1996. He promptly stopped working and sent transition letters to his customers informing them that he had left the company. Because Mr. Palasota refused to release Haggar from ADEA liability, Haggar suspended his severance pay after three months.

II.

In this second appeal, of course, Haggar may not challenge the jury's finding that it terminated Palasota's employment because of his age in violation of the ADEA. That issue was conclusively resolved against Haggar by the previous panel's decision in Haggar's first appeal and is therefore the law of this case. Free v. Abbott Labs., Inc., 164 F.3d 270, 272 (5th Cir. 1999). In its present appeal, however, Haggar can and does challenge issues not reached in the first appeal, viz., the jury's finding that Haggar acted willfully in its ADEA violation (which formed the basis of the liquidated damages award), the jury's calculations of Palasota's financial loss caused by the violation (used as a basis for the back pay award), as well as the district court's decision to order Haggar to reinstate Palasota and pay him both lump sum and monthly front pay. We turn first to Haggar's challenge to the parts of the district court's judgment that denied Haggar's motion for judgment as a matter of law, and that, instead, sustained Palasota's jury verdict on financial loss (which determines back pay) and employer wilfulness (which determines whether liquidated damages are awarded).

We review a district court's denial of a motion for judgment as a matter of law de novo. Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235 (5th Cir. 2001) (citing Ford v. Cimarron Ins. Co., 230 F.3d 828, 830 (5th Cir. 2000)); Brown v. Bryan County, Okla., 219 F.3d 450, 456 (5th Cir. 2000). As set out by Federal Rule of Civil Procedure 50, we may only render judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED.R.CIV.P. 50(a); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000); Ford, 230 F.3d at 830.

"In entertaining a Rule 50 motion for judgment as a matter of law [we] must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or

weigh the evidence." Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 337 (5th Cir. 2001). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves, 530 U.S. at 150-51(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). While we review the record as a whole, we must "disregard all evidence favorable to the moving party that the jury is not required to believe." Ellis, 258 F.3d at 337 (citing Reeves, 530 U.S. at 151). Thus, we are required to "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Id. (quoting WRIGHT & MILLER § 2529).

After reviewing the record, we conclude that the district court correctly analyzed the evidence and applied Rule 50, not simply for the district court's stated reasons, but also because of additional evidence in the record from which the jury reasonably could have found that Haggar's violation was willful and reasonably could have calculated the amount of his resulting financial loss.

## A.

In this appeal, Haggar's arguments with regard to willfulness merely parallel its previous argument on the violation issue, viz., that Haggar's employment decisions were not discriminatory or intended to cause Palasota to suffer economic loss or employment termination; and that Haggar believed Palasota had resigned voluntarily rather than being forced out of the company by Haggar's employment decisions. It is possible for an employer to violate the ADEA without doing so willfully, i.e., without knowingly or recklessly disregarding whether its conduct was prohibited by the statute. Hazen Paper Co. v. Biggins, 507 U.S. 604, 616 (1993); West v. Nabors Drilling USA, Inc., 330 F.3d 379, 391 (5th Cir. 2003). Here, however, there existed a fully sufficient evidentiary basis for the jury to reasonably find Haggar guilty of a willful

violation. The previous panel, in reversing the district court's judgment as a matter of law in favor of Haggar, concluded that the jury reasonably found Haggar had violated the ADEA, based on, inter alia, the following evidence:

> Between December 1, 1996, and March 31, 1998, Haggar terminated 12 Sales Associates forty years of age or older, including Palasota, while hiring 13 new [Retail Marketing Associates (RMAs)], only one of whom was over forty years of age. Haggar's chief financial officer testified that the increase in the number of RMAs and the decrease in the number of Sales Associates were related and offset each other in the company's sales budget.

> . . . .

> In late 1995, Haggar's President, Frank Bracken, stated that he wanted "race horses" and not "plow horses," while telling Palasota that he was out of the "old school" of selling. Bracken announced at a sales meeting that there was a significant "graying of the sales force." Alan Burks, a member of management, stated at a sales executive meeting: "Hey, fellows, let's face it, we've got an ageing, graying sales force out there. Sales are bad, and we've got to figure out a way to get through it."

> . . . .

> Palasota produced evidence . . . from which a reasonable juror could conclude that he was terminated as part of Haggar's plan to turn Sales Associate duties over to younger RMAs. For example . . . the February 23, 1996, memorandum from Tim Lyons to Haggar executives Frank Bracken, Joe Haggar, III, and Alan Burks. In that memo, Lyons discusses Palasota's displeasure with the company's offer of a standard severance package. Lyons then shifts focus, recommending severance packages for fourteen named Sales

6

Associates, all of whom are specifically identified as over fifty years of age, in order to "thin the ranks" as part of a transition period. The memo states that, by eliminating employees over fifty years of age, "we will have the flexibility to bring on some new players that can help us achieve our growth plans."

. . .The memo, which is undeniably age-related, was composed approximately two months before Palasota's termination. Lyons, Vice President of Sales/Casual, was empowered to terminate Palasota, as well as offer severance packages to other employees. In no uncertain terms, the memo discusses a broad plan to "thin the ranks" of older Sales Associates in order to "ease the anxiety of this transition period."

Haggar contends the memo merely discusses the possibility of providing severance packages to three employees requesting them, including Palasota. This ignores the fact that 14 employees over fifty years of age, at least 11 of whom did not request severance packages, were targeted for offers. Haggar does not explain why, as part of its plan to "reconfigure" its sales staff, only older associates were selected, nor why RMAs were simultaneously hired to perform sales duties.

. . .Within two months after Palasota refused to accept the severance package, he was "eliminated"; the stated reason for termination was a "reconfiguration of the sales force." Between December 1, 1996, and March 31, 1998, Haggar terminated twelve Sales Associates, including Palasota. . . . Ninety-five percent of the

Sales Associates were males over the age forty, while ninety-five percent of the RMAs were females under forty. Haggar's chief financial officer testified that increases in the number of RMAs and declines in Sales Associates were designed to offset one another. The former head of Haggar's J.C. Penney account testified that "there was no difference" between the RMAs and Sales Associates, and that the transition was part of a plan to shift sales responsibilities to the younger, predominantly female, RMAs. Coupled with Haggar's mid-1990s campaign to present a more youthful image, a reasonable juror could conclude that Palasota was terminated because of his age.

. . .[T]he EEOC's determination [found] reasonable cause, made after a two and one-half year investigation, to believe that Palasota and similarly situated Sales Associates were discharged in violation of the ADEA. "[A]n EEOC determination prepared by professional investigators on behalf of an impartial agency, [is] highly probative." Plummer v. Western Int'l Hotels Co., 656 F.2d 502, 505 (9th Cir.1981) (citing Peters v. Jefferson Chem. Co., 516 F.2d 447, 450-51 (5th Cir.1975)).

Palasota I, 342 F.3d at 572-77 & n.13 (some citations and quotation marks omitted). Additionally, Haggar's unsuccessful efforts to have Palasota release it from ADEA claims upon his termination tended to show that Haggar had knowingly violated the ADEA or recklessly disregarded whether its conduct toward Palasota was prohibited by the statute.

Applying the standards dictated by Rule 50 and Reeves, it is apparent that Haggar is not entitled to judgment as a matter of law on the willfulness issue.

After reviewing all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, refraining from credibility determinations or weighing the evidence, and disregarding all evidence favorable to the moving party that the jury was not required to believe, we conclude that there was a legally sufficient evidentiary basis for a reasonable jury to find that Haggar knew or at least showed reckless disregard for whether its employment decisions affecting Palasota were prohibited by the ADEA.

B.

Back pay encompasses what the plaintiff would have received in compensation but for the employer's violation of the ADEA.[2] Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 937 n.8 (5th Cir. 1996) (citing Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197 (1941)). In general, back pay liability in a wrongful termination case commences from the time the discriminatory conduct causes economic injury[3] and ends upon the date of the judgment.[4] In other words, back pay accrues from the date of the commencement of the discriminatory course of conduct causing financial loss until the date damages are "settled."[5]

---

[2] See also 1 B. LINDEMANN & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 635 (3d ed. 1996). Lindemann relies largely on Title VII cases like Patterson, cited above. The ADEA was modeled on Title VII; the remedial provisions of both statutes are meant to force employers to examine employment practices in an endeavor to eliminate any vestiges of discrimination. McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 358 (1995).

[3] See, e.g., Mills v. Int'l Bhd. of Teamsters, 634 F.2d 282, 283 (5th Cir. 1981); See 2 MERRICK T. ROSSEIN, 2 EMPLOYMENT DISCRIMINATION LAW AND LITIGATION § 18.9 (2007 ed.)(collecting authorities).

[4] Shore v. Fed. Express Corp., 777 F.2d 1155, 1158 (6th Cir. 1985); Nord v. U.S. Steel Corp., 758 F.2d 1462, 1473 (11th Cir. 1985). See ROSSEIN, supra n.3, § 18.9 (collecting authorities).

[5] See, e.g., Kolb v. Goldring, Inc., 694 F.2d 869, 874 & n.4 (1st Cir. 1982)(stating that damages are "settled" on the date of judgment, or when the plaintiff obtains a higher-paying new position, whichever is earlier).

The district court's charge to the jury on back pay consisted of a medley of instructions pertaining to the concept of damages as making Palasota whole as well as the period during which back pay accrues. Thus, the jury was told to "assess damages for the income lost by Palasota from the date he was terminated, in this case May 10, 1996, until the date of trial . . . ." But it was also instructed as follows:

> "[Y]ou must then determine an amount that is fair compensation for the damages sustained by Palasota. The purpose of damages is to make a plaintiff whole – that is to compensate Palasota for any injuries that he has suffered. . . . for injuries that Palasota proves were proximately caused by Haggars' (sic) allegedly wrongful conduct."

The jury was also instructed to answer this interrogatory: "What amount of financial damages, if any, did Palasota sustain as a result of actions taken by Haggar on account of his age . . . ?"

Further, the jury was instructed as to the diametrically opposed contentions of the parties. "Palasota contends that he was terminated . . . based upon his age . . . as part of a plan implemented by Haggar to eliminate older males from the sales force and transfer the sales responsibilities to younger females and that such transfer . . . constituted age . . . discrimination." Haggar contended, however, according to the court's instructions, that Palasota was not terminated because of his age, but that he voluntarily left Haggar because "Palasota's key account, Dillard's, was no longer purchasing Haggar's products."

Undisputedly then, Palasota was entitled to back pay based on the accrual of his economic damage during the period from his termination to the date of the trial. The parties disagree, however, on whether the jury used a reasonable method to calculate the accruement of damages during that period. Haggar contends that the jury unreasonably overcompensated Palasota because it used

10

as a baseline for measuring his economic damage his earnings rate in 1995 - $175,000 per annum - rather than his earnings rate at the time of his termination on May 10, 1996 - $85,6000 per annum. Palasota, on the other hand, argues that the jury was correctly instructed to compensate him for all injuries proximately caused by Haggar's wrongful conduct in order to make him whole and that requiring Haggar to repair him only at the rate of his depressed earnings level, deliberately brought about by Haggar as part of its continuing plan to eliminate older males, would not make him whole or fairly compensate him for the damage he sustained.

Because the jury was also instructed "not to single out one instruction alone as . . . the law, but . . . consider the instructions as a whole," we conclude that it was not impermissible or unreasonable for the jury to take into account all of the economic injury and damage that Palasota suffered as a result of Haggar's continuing scheme and violation in quantifying the "amount of financial damages . . . Palasota sustain[ed] as a result of actions taken by Haggar on account of his age . . . ." When a continuing violation has been perpetrated, a defendant employer is not shielded from back-pay liability simply because the defendant's earlier discriminatory acts occurred outside the limitations period; rather, a court may take into account the effects occurring within the back-pay accrual period that stemmed from the acts of discrimination occurring earlier. See, e.g., Rendon v. AT&T Techs., 883 F.2d 388, 395-96 (5th Cir. 1989); Messer v. Meno, 130 F.3d 130, 134-35 (5th Cir. 1997); Glass v. Petro-Tex Chem. Corp., 757 F.2d 1554, 1561 (5th Cir. 1985); Thompson v. Sawyer, 678 F.2d 257, 290-91 (D.C. Cir. 1982); Crawford v. Western Elec. Co., 614 F.2d 1300, 1309 (5th Cir. 1980); Acha v. Beame, 570 F.2d 57, 65 (2d Cir. 1978); Verzosa v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 589 F.2d 974, 976-

77 (9th Cir. 1978); 2 LINDEMANN & GROSSMAN, supra note 2, at 1789 & n.84; 2 ROSSEIN, supra note 3, § 18.9.[6]

In this case, the jury reasonably could have found that Haggar successfully engaged in a scheme of willful discriminatory age-based acts designed to replace its ageing sales force with a younger, less highly paid one. In respect to Palasota, the jury reasonably could have found that the scheme began with Haggar's refusal to assign him to a lucrative territory in early 1995 in order to reduce his earnings rate before terminating him in 1996. From this and the other evidence, the jury legitimately could have determined that but for Haggar's scheme of willful ADEA violations, Palasota would have attained earnings rate levels of at least $175,000 per year from early 1995 through the dates of the trial and the jury's verdict.

In assessing Palasota's loss, the jury apparently found and accounted for the fact that his earnings rate would have been $175,000 per annum at his termination but for the impact on Palasota of Haggar's scheme to rejuvenate its sales force in violation of the ADEA.[7] After reviewing the record, we conclude,

---

[6] The prior panel in this case, in effect, determined that the jury reasonably could have found that Palasota was the victim of a continuing violation when it concluded, inter alia, that "[t]he jury was entitled to believe Palasota's theory that older Sales Associates were pushed out in favor of younger RMAs as part of a plan to bring a more youthful appearance to Haggar." Palasota I, 342 F.3d at 578. As discussed in Palasota I, Palasota introduced evidence at trial that part of the plan to push him out was Haggar's decision to shift Palasota to less lucrative accounts (with a corresponding drop in salary) after the loss of the Dillard's account. Id. at 572. The jury was not unreasonable in accounting for the effects of that discrimination in calculating Mr. Palasota's backpay from the date of termination using the salary he would have earned but for Haggar's earlier actions.

[7] Although the jury verdict does not expressly state the income level used in its calculations, its result is reasonably consistent with finding that Palasota would have earned $175,000 per year (his 1995 income) but for Haggar's discriminatory employment decisions. That income stream would have produced $998,698.63 in income between his termination on May 10, 2006, and the January 22, 2002, judgment. From this amount, his severance payments and other post-termination economic

from the evidence stipulated to by the parties and introduced at trial, that the jury reasonably found the following facts:

(1) Haggar conceived of and successfully executed a plan and continuing violation to force Palasota and a dozen other Sales Associates over the age of 40 to resign and to replace them with 13 new salespersons, called Retail Marketing Associates, only one of whom was over 40 years old;

(2) that the sole purpose of the plan and continuing violation was to replace Haggar's aging sales force, including Palasota, with persons that were younger and more youthful in appearance;

(3) that the first discriminatory act in the plan and continuing violation by Haggar against Palasota and the other ageing Sales Associates was the company's refusal in late 1995 to place him in charge of a new territory including major stores in Houston, San

---

benefits of roughly $43,570 must be subtracted, reducing the potential award of back pay to $962,680. Then, that amount must be discounted by another $93,000 or so, to account for the income he earned from his employment by Dickie, reducing the highest supportable jury award to $869,680, a number exceeding but within range of the actual jury award of $842,218.96.

| Lost Earnings | $175,000/yr | 2083 days | $998,698.63 |
|---|---|---|---|
| Severance pay | | | - $43,570.00 |
| Dickie salary | | | - $93,000 |
| Highest Possible Award | | | $862,128.63 |
| Actual Award | | | $842,218.96 |

Antonio, and Austin as proposed by Haggar's National Sales Manager at that time, James Thompson; and

(4) that Palasota, who was consistently earning approximately $175,000 per year at that time was the best candidate to assume responsibility of those accounts; that it was part of Haggar's plan and continuing violation to systematically reduce Palasota's earnings rate before finally terminating him in order to minimize its exposure to liability under ADEA.

But for Haggar's discriminatory campaign, Palasota would have continued to earn income comparable to his peak earnings of $175,000 per year that he was achieving in early 1995 until the date of the judgment. Instead, however, the record shows, the jury reasonably could have found that Haggar relegated Palasota to the position of tending to a group of less lucrative trade accounts in East Texas and Louisiana; that Haggar committed this discriminatory act as part of a continuing plan and violation against Palasota for the sole purpose of reducing his annual commissions income, ultimately forcing his resignation, and carrying out its plan to replace its ageing sales force with persons under 40 years old; and that on April 29, 1996, Haggar's plan and continuing violation culminated, insofar as Palasota was concerned, with its notifying him that his position was being eliminated as part of a "reconfiguration of the sales force."

In sum, it is evident that the jury calculated the back pay to which Palasota was entitled by finding from the evidence that (1) Palasota earned $175,000 per annum as a sales associate with Haggar up until the beginning of Haggar's discriminatory acts and continuing violation against him, which were part of a larger plan to reduce his earnings, force his resignation, and rejuvenate its sales force; (2) as part of its age discrimination plan and continuing violation, Haggar assigned Palasota to a much less lucrative sales

territory rather than to a more fertile one for which he was the most qualified employee; and (3) Palasota's financial losses caused by Haggar's continuing ADEA violations from the date of his termination until the date of the judgment amounted to the total sum of $824,218.96. We cannot say that the jury erred or acted unreasonably in this regard. Compensating Palasota merely at the depressed earnings rate deliberately brought about by Haggar as part of its willfully unlawful scheme and continuing violation would unjustly reward Haggar by reducing its cost of perpetrating that scheme; and it would unfairly penalize Palasota.

C.

Certain events or circumstances may serve to cut off an employee's entitlement to back pay prior to the date of the judgment, such as, for example, the plaintiff's employment in a higher-paying job[8] or "the plaintiff's failure to seek other employment with reasonable care and diligence."[9] See 2 LINDEMANN & GROSSMAN, supra note 2, at 637; see also 2 ROSSEIN, supra note 3, § 18.9 ("Although generally the back pay period commences when the discrimination began or occurred and ends the day of [the] judgment, various factors can affect the determination.") (citing, inter alia, Mills v. Int'l Bhd. of Teamsters, 634 F.2d 282 (5th Cir. 1981)). Moreover, under the ADEA the plaintiff is required to mitigate damages by using reasonable efforts to obtain and maintain comparable employment following his termination. West v. Nabors Drilling USA, Inc., 330 F.3d 379, 393 (5th Cir. 2003). We have defined "comparable" or "substantially equivalent" employment as that which "affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status

---

[8] Kolb, 694 F.2d at 874 n.4.

[9] Hansard v. Pepsi-Cola Metro. Bottling Co., 865 F.2d 1461, 1468 (5th Cir. 1989).

15

as the position from which the. . .claimant has been discriminatorily terminated." Id. (internal quotations omitted) (quoting Sellers v. Delgado Cmty. Coll., 902 F.2d 1189, 1193 (5th Cir. 1990) (Title VII case)).

Although the employer has the initial burden of proof regarding a discharged employee's failure to mitigate, the burden shifts to the employee where comparable employment is found but later lost. Patterson, 90 F.3d at 936 (discussing the issue in the context of Title VII). In that event, the plaintiff must show that he exercised "reasonable diligence in maintaining that substantially similar employment." Id. A plaintiff must resume a reasonably diligent search for a new job if the first substantially similar job is lost through no fault of his own. Id. at 937 (holding that plaintiff was reasonably diligent where she continued to look for new employment after a first part-time position ended and where she was not fired but rather voluntarily resigned her later jobs); see also Hansard, 865 F.2d at 1468 (stating "[a] plaintiff may not simply abandon his job search and continue to recover back pay,"). Back pay is tolled (that is, not awarded) for the period of time the plaintiff is employed in a comparable position. Brunnemann v. Terra Int'l, Inc. 975 F.2d 175, 178 n.5 (5th Cir. 1992).

In ruling on Haggar's motion for judgment as a matter of law with respect to back pay, the district court stated that the jury did not toll the award of back pay for the length of Palasota's employment at Dickie; although it did, however, reduce the backpay award by his earnings over that time. On appeal, Haggar argues that the jury was unreasonable in not tolling back pay during Palasota's job with Dickie because it entailed essentially the same functions he had performed for Haggar.[10]

---

[10] As a preliminary matter, Palasota contends that Haggar has waived the failure to mitigate argument by failing to plead it in its answer to Palasota's complaint. See FED. R. CIV. P. 8(c) (classing the argument as an affirmative defense which must be pleaded by the defendant in its answer). Haggar tacitly acknowledges its failure in this respect, but asserts that the record shows that Palasota tried the issue by implied

Haggar relies solely on evidence that Palasota earned $125,000 a year at Dickie, and that under his employment contract there he potentially could receive $50,000 to $75,000 more in commissions. Haggar argues that Palasota's actual and potential income at Dickie matched or exceeded both Palasota's predicted annual income of $85,600 at Haggar at the time of his termination and his 1995 income of $175,000. It is not genuinely disputed that the work was similar in kind: in both positions, Palasota sold menswear to retailers. Palasota correctly points out, however, that Haggar presented no evidence regarding promotional opportunities, job responsibilities, working conditions, or status, and that Haggar simply asserts that "no additional evidence was required" to show that the two positions were substantially equivalent.

---

consent, or at the very least, waived all possible objections by failing to object as required. See FED. R. CIV. P. 15(b)("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); FED. R. CIV. P. 51 (objections to jury instructions); FED. R. EVID. 103 (objections to evidence).

Our review of the record indicates that Palasota failed to object to the issue when raised in the jury instruction, actively solicited testimony at trial on mitigation via cross-examination of Dickie's management, put on his own evidence regarding his attempts to mitigate (namely, testimony from an executive search firm), and failed to object to Haggar's introduction of evidence pertaining to Palasota's mitigation efforts. As a result, Haggar argues, the issue was tried by implied consent.

We have held that "where [a] matter is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply precisely with Rule 8(c) is not fatal." United States v. Shanbaum, 10 F.3d 305, 312 (5th Cir. 1994) (internal quotations omitted) (quoting Lucas v. United States, 807 F.2d 414, 417 (5th Cir. 1986)). In the case at bar, both parties spent extensive time discussing the issue of mitigation at trial. See Shanbaum, 10 F.3d at 313 (citing Haught v. Maceluch, 681 F.2d 291, 305-306 (5th Cir. 1982)) ("Whether an issue has been tried with the implied consent of the parties depends upon whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond."). The record is clear that no such surprise resulted here. We therefore decline to accept Palasota's assertion of waiver and address Haggar's argument on the merits.

Haggar's assertion therefore misses the point. We must consider whether "'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" FED.R.CIV.P. 50(a). Here, the jury apparently found that the evidence did not support Haggar's assertion that the jobs were comparable and therefore refused to toll damages during Palasota's employment with Dickie. We have already determined that the jury reasonably used Mr. Palasota's 1995 earnings rate of $175,000 per annum as a baseline for determining the quantum of his economic damage caused by Haggar's wilful ADEA violaton. Palasota's compensation by Dickie is plainly not comparable to his $175,000 earnings rate at Haggar unless he actually realized the additional "potential" for commissions mentioned only as a possibility in his Dickie employment contract. The evidence presented by Haggar on this and other aspects of Palasota's employment situation with Dickie is not so compelling that we must conclude that the jury unreasonably refused to toll his right to back pay during his Dickie employment. Further, while the industry and basic nature of the work may have been the same, the jury reasonably could have found that the newly hired Palasota would not have received the same status or responsibilities, or that Palasota would not have received other benefits that he was accorded by his former employment by Haggar. See, e.g., Boehms v. Crowell, 139 F.3d 452, 459-60 (5th Cir. 1998) (holding that a position was not comparable despite identical salary and similar general area of expertise where position was considered "inferior" to the previous position in status and supervisory and budgetary authority).

### III.

We next address Haggar's appeal from the equitable relief granted Palasota by the district court on remand. The ADEA vests the court with discretion "to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter." 29 U.S.C. § 626(b). We therefore review

the award of equitable remedies, such as front pay and reinstatement, for abuse of that discretion. Deloach v. Delchamps, Inc., 897 F.2d 815, 822 (5th Cir. 1990).

The central purpose of the ADEA is "mak[ing] the individual victim of discrimination whole." Julian v. City of Houston, 314 F.3d 721, 728 (5th Cir. 2002). In structuring its remedies, the court may when justified include judgments compelling employment, reinstatement, or promotion. 29 U.S.C. § 626(b). The court must take care, however, that its fashioned remedy only goes so far as to compensate the victim: ADEA remedies are not meant to punish the defendant or award plaintiff a windfall. Deloach, 897 F.2d at 823.

In the case before us, the district court ordered both Mr. Palasota's reinstatement to the first available sales associate vacancy in Dallas and ordered Haggar to provide monthly front pay of $14,583.33 until such reinstatement occurred. In addition, the district court ordered Haggar to pay a lump sum award of front pay of $524,999.98 to cover the 36 months between the date of the verdict (January 22, 2002) and the date of its order assigning equitable remedies (January 28, 2005), in order to compensate Mr. Palasota for the delay in rendering judgment on the jury's verdict due to his first appeal. Haggar argues 1) that the district court abused its discretion in awarding reinstatement and accompanying interim front pay and 2) that the district court abused its discretion in awarding a lump sum of front pay.[11] We address each argument in turn.

A.

---

[11] Haggar also urges this court to hold that the only proper way in which front pay can be used to supplement reinstatement is as interim front pay pending reinstatement of a verdict after judgment. Because, as we discuss below, we reverse the district court's awards of reinstatement, interim front pay, and lump sum front pay, and remand the award of lump sum front pay for reconsideration, we need not reach this argument in this review.

"The selection between reinstatement and front pay is discretionary with the trial court so long as the relief granted is consistent with the purposes of the ADEA." Brunnemann, 975 F.2d at 180. Nevertheless, reinstatement is by far the preferred remedy in an ADEA case. Hansard, 865 F.2d at 1469. As a result, the district court must consider "and adequately articulate" its reasons for finding reinstatement to be infeasible and for considering an award of front pay instead. Julian, 314 F.3d at 729; see also Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir. 1992); Deloach, 897 F.2d at 822. In reviewing a district court's decision to award reinstatement, we have considered a number of factors, including whether positions now exist comparable to the plaintiff's former position and whether reinstatement would require an employer to displace an existing employee. See Ray v. Iuka Special Mun. Separate Sch. Dist., 51 F.3d 1246, 1254-55 (5th Cir. 1995); see also Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1346 (9th Cir. 1987). We have also considered whether the plaintiff has changed careers and whether animosity exists between the plaintiff and his former employer. See Ray, 51 F.3d at 1254-55; Deloach, 897 F.2d at 822. In the present case, the district court stated only that the parties had demonstrated no great hostility or animosity, without discussing the other feasibility factors that should be considered or giving reasons for ordering both reinstatement and front pay.

Our review of the record indicates that there is no sales position comparable to Palasota's former position at Haggar to which he could be reinstated, and that rehiring Palasota would require either termination of another employee or a decrease in each current employee's sales territory and salary.[12] Haggar's present sales force is composed of twenty-three associates,

---

[12]   Mr. Palasota's motion to supplement the record with evidence of the resignation of Haggar's Vice President of Sales in 2005 is denied. We are limited in our consideration to that information properly before the district court at the time of its decision. See Andrade v. Chojnacki, 338 F.3d 448, 459-60 (5th Cir. 2003).

who work on commission and are not guaranteed a particular income. Further, Haggar introduced testimony indicating that Mr. Palasota's former position provided him with a broad range of clients, including individual stores tied to key accounts as well as smaller trade accounts divided up by territories. Today, the trade accounts are divided among four sales associates; the remaining associates manage the national key accounts. Haggar cannot provide Mr. Palasota with a sales base similar to the one he originally managed; to do so, the company would have to either eliminate a current employee tied to a key account, eliminate an employee tied to a trade account, or reduce each of the trade account territories by 25% to create a new position (thereby reducing compensation for the associates assigned to those territories). In addition, Haggar's managers testified at trial that the company has not hired any new associates since a round of layoffs in November 2002. They indicated that the company does not plan to hire more and, furthermore, that more reductions are likely in the future. Reinstating Mr. Palasota, therefore, requires ousting and/or reducing the compensation of innocent incumbents. We have held that, except under extraordinary circumstances not present here, innocent incumbents may not be displaced. See Gamble v. Birmingham Southern R.R. Co., 514 F.2d 678, 684 (5th Cir. 1975); see also Lander v. Lujan, 888 F.2d 153, 157 & n.5 (D.C. Cir. 1989) (recognizing the state of Fifth Circuit law on this point). The fact that Haggar's lack of openings is not the result of employer recalcitrance, but rather of changes in the market and corporate management structure over the last two decades, reinforces our reluctance to order reinstatement in this case.

Further, the record indicates the existence of numerous other factors suggesting that reinstatement is not feasible. First, Haggar's compensation structure is such that the company can no longer guarantee Palasota the $175,000 salary he earned in 1995. Palasota acknowledged in court that he would not be interested in returning to Haggar for a yearly income of $75,000 -

and would be ambivalent about returning even if he earned $100,000 a year. Second, Palasota left the clothing industry in 1998 to become a realtor; by the time of trial he had opened his own brokerage business. Finally, the record suggests some lingering animosity between the parties: Palasota alleges that Haggar's management attempted to black-ball him in the industry; Haggar alleges that Palasota falsified expense reports while employed at Haggar, an offense for which other Haggar employees have allegedly been terminated.

For these reasons, we reverse the district court's award of reinstatement and interim front pay and render judgment for Haggar and against Palasota on these issues.

## B.

Haggar next argues that the district court abused its discretion in awarding lump sum front pay.[13]  Again, an award of front pay is meant "to

---

[13]  Palasota argues on cross-appeal that the district court erred in classing this lump sum as front pay, rather than adding it in to his back pay award, based on the fact that the lump sum is meant to "extend" his back pay award to compensate him for the delay between his jury verdict and final judgment.

"[D]etermination of the proper period for awarding back pay is a factual matter that should be set aside only if clearly erroneous."  Tyler v. Union Oil Co. of Cal., 304 F.3d 379, 401 (5th Cir. 2002); see also McKennon, 513 U.S. at 361 (when awarding back pay, the district court may account for "factual permutations" in the particular case in the context of after-discovered employee wrongdoing). In Brunnemann, 975 F.2d at 175 n.5, we noted that because "Brunnemann was terminated on August 31, 1988, and the date of judgment was April 24, 1991, therefore, the maximum time period for calculation of the jury award [of back pay] is 32 months" –that is, the time elapsed between the date of his termination and the date of the jury verdict. Id. Moreover, in Purcell, 299 F.2d at 961, we considered the way in which a court might address the gap in compensation caused by appeal-related delay: "[o]n remand, the district court can reconsider its reinstatement order in light of the passage of time. It can either award compensation to cover the lost wages during the stay, or it can determine that reinstatement is no longer feasible and award front pay." Id. Both cases contemplate that where final judgment in a case is delayed by appeal, a district court can properly limit the end of the back pay award period to the date of the jury verdict. We cannot say, based on the facts of this case and our governing case law, that the district court clearly erred in classifying the lump sum award of $524,999.98 as front pay.

compensate the plaintiff for wages and benefits he would have received from the defendant employer in the future if not for the discrimination." Tyler, 304 F.3d 387, 402 (5th Cir. 2002). Unlike back pay, however, which compensates plaintiff for damage suffered between the date of injury and the date of final judgment in his favor, front pay is a prospective remedy that estimates the damage plaintiff will continue to suffer after the date of final judgment as a result of the wrongdoing. We have held that "a substantial liquidated damage award may indicate that an additional award of front pay is inappropriate or excessive." Walther, 952 F.2d at 127. Haggar now relies on Walther to argue that Mr. Palasota's recovery of liquidated damages should bar his recovery of the additional lump sum of front pay.

The reasoning behind the principle stated in Walther is that receipt of "a substantial liquidated damage award further strengthens the court's judgment that [the plaintiff] has already been made whole." Hybert v. Hearst Corp., 900 F.2d 1050, 1056 (7th Cir. 1990) (quoting Rengers v. WCLR Radio Station, 661 F. Supp. 649, 651 (N.D. Ill. 1986)); see also Walther, 952 F.2d at 127. This court has emphasized that the size of a liquidated damages award is only an indicator of the propriety of front pay, not a bright line rule. Shattuck v. Kinetic Concepts Inc., 49 F.3d 1106, 1110 (5th Cir. 1995). Furthermore, the line of Seventh Circuit cases on which we have relied in crafting our rule notes that

> while previous cases, illustrated by Hybert v. Hearst Corp., 900 F.2d 1050, 105[6] (7th Cir. 1990), and most recently by EEOC v. Century Broadcasting Corp., supra, 957 F.2d [1446, 1464], suggest that the presence or absence of a liquidated damages award is material in determining entitlement to front pay, we think it should play only a very small role in that determination.

Price v. Marshall Erdman & Assocs., 966 F.2d 320, 326 (7th Cir. 1992).

The district court in this case, however, did not consider whether the liquidated damages award should preclude or mitigate an award of front pay here. Because the district court's opinion includes no reasoning on this subject, we cannot effectively review the decision without greater explanation of its rationale. See Walther, 952 F.2d at 127-28; see also Hadley v. VAM P T S, 44 F.3d 372, 376 (5th Cir. 1995); Hybert, 900 F.2d at 1056. We, like the Walther court, find it most appropriate to vacate the award of front pay and remand to the district court "for a more thorough evaluation of [the] issue[]." Walther, 952 F.2d at 128.

Because we remand, we do not address the remainder of Haggar's arguments regarding front pay. We note, however, that although we will generally accord "wide latitude" to the district courts in the determination of front pay, we have also emphasized that such awards must be carefully crafted to avoid a windfall to the plaintiff, as damages under the ADEA are not meant to be punitive. See Deloach, 897 F.2d at 822-23; see also Julian, 314 F.3d 721 at 729 (discussing some of the factors a court should consider "when determining whether a front pay award is equitably required and, if so, for what period of time").

## CONCLUSION

For these reasons, we AFFIRM the district court's judgment, except that we reverse and render judgment for Haggar and against Palasota on his claims for reinstatement and interim front pay, and we VACATE the award of lump sum front pay and REMAND the case for further consideration of whether the liquidated damages award precludes or mitigates the award of lump sum front pay, and to render judgment consistent with this opinion.