REVISED JULY 1, 2002
UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 01-50905
_____

EUGENE CANTU,

Plaintiff-Appellee,

VERSUS

MATHEW JONES, ETC., ET AL.,

Defendants,

MATHEW JONES, Correctional Officer; RICHARD WALTERSDORF,
Correctional Officer; JOHN BEAIRD, Correctional Officer,

Defendants-Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas
_____
June 11, 2002

Before DUHÉ, DeMOSS, and CLEMENT, Circuit Judges.

DeMOSS, Circuit Judge:

Eugene Cantu filed a civil rights lawsuit on July 3, 2000, accusing Mathew Jones, John Beaird, Richard Waltersdorf, Gary Johnson, and the Texas Department of Criminal Justice, Institutional Division ("TDCJ-ID") of violating his constitutional

right to be free from cruel and unusual punishment after he was attacked by another inmate with a razor blade.  Cantu based his claim on the theory that the defendants allowed Carlos Hernandez to escape from his cell and attack Cantu.  Defendants denied Cantu's allegations and asserted the defense of qualified immunity.

A jury trial began on July 3, 2001, and Cantu elected to proceed against only Jones, Waltersdorf and Beaird on his constitutional deliberate indifference claim.  The jury returned a verdict for Cantu, finding that the defendants had violated Cantu's constitutional rights and were not entitled to qualified immunity, and awarding Cantu $22,500 in compensatory damages.  Defendants now appeal, claiming there was insufficient evidence for the jury to find for Cantu, and, in the alternative, that they are entitled to qualified immunity.

**BACKGROUND**

Cantu entered TDCJ-ID in 1981 and joined a group known as the Mexican Mafia prison gang in 1984.  Cantu declared himself to be an ex-gang member in 1994, but TDCJ-ID continued to classify him as a member of the Mexican Mafia.  On February 24, 1999, Carlos Hernandez, another inmate who was a member of the Mexican Mafia, escaped from his cell and attacked Cantu with a razor blade. Though the appellants contend that this was part of the Mexican Mafia's "blood-out" policy of murdering ex-gang members, Cantu believes that the assault was orchestrated by officers at TDCJ-ID.

2

On the day of the attack, both Cantu and Hernandez were housed in the same maximum-security area of the Connally Unit in Kenedy, Texas. The area they were housed in is known as the F-Pod of administrative segregation. Offenders incarcerated in administrative segregation remain alone in their cells for 23 hours a day and are allowed out of their cells for only one hour of recreation each day followed by a shower. Most of the offenders placed in administrative segregation are there because of gang membership.

Every time an administrative segregation offender comes out of his cell, TDCJ-ID policy requires that he be under the control of two correctional officers known as "rovers." The rovers stand outside the cell, search and handcuff the offender in the cell, and then signal to a third correctional officer stationed in the picket to open the cell door. The picket officer opens the cell door electronically by pushing a button on a control panel. This picket officer is responsible for operating all of the locks and doors in the six sections of F-Pod.

On the day Cantu was attacked, Waltersdorf was a rover, and Jones was the picket officer in F-Pod. Beaird was not in F-Pod on the day Cantu was attacked. The only other correctional officer in F-Pod was Mark Simecek, another rover. At this time, the Connally Unit was understaffed, so Waltersdorf and Simecek split up and escorted offenders to recreation by themselves, in violation of

TDCJ-ID policy. Each took half of F-Pod, with Waltersdorf covering the sections containing Cantu and Hernandez. On the day of the attack, Cantu was housed downstairs in Section C, Cell 34, and Hernandez was housed upstairs in Section B, Cell 25. A wall separates Section B from Section C, with the only opening being a door between the sections located on the second floor. This door is supposed to be locked at all times and can only be opened by the picket officer. Sections B and C are structured so that persons in Section B cannot see into Section C and vice versa. Similarly, inmates in one section of F-Pod cannot hear sounds from the other sections of F-Pod.

On the day of the attack, Waltersdorf, working his third or fourth day as a shift rover,[1] removed Hernandez from his cell. Following recreation and a shower, Waltersdorf strip-searched Hernandez and placed him back in his cell. Though Waltersdorf claims to have then closed the cell door and pulled on it to make sure it was locked, the door was not secure. The appellants claim that Hernandez was able to manipulate the door with a piece of string and toilet paper so as to make the top lock not become completely secure. The appellants claim that Hernandez was then able to lift the door up out of its bottom lock to escape.

---

[1]It appears that Waltersdorf was previously working a shift at TDCJ-ID that did not require him to escort inmates from their cells.

4

After placing Hernandez in his cell, Waltersdorf then walked down the second row of cells and went through the door separating Section B from Section C. Waltersdorf claims that he then slammed the door shut behind him but did not check to make sure it was locked as it was supposed to lock automatically and electronically when it closes. The door, however, was not locked. Jones, the picket officer, claimed that he was watching the rovers at this time and did not notice that the section door was unlocked. Though there are picket lights that indicate whether a door is secure or not, Jones claims that he was not facing the picket lights.

After shutting the section door, Waltersdorf proceeded down a flight of stairs to the first row in Section C. Though administrative inmates are escorted to their one hour of recreation according to a set schedule, for some reason, Waltersdorf took Cantu for recreation out of turn on the day of the attack, escorting him immediately after Hernandez.[2] Waltersdorf testified that it took him approximately three minutes to walk down to Cantu's cell and let him out after returning Hernandez to his cell. Waltersdorf searched and handcuffed Cantu and then Jones unlocked Cantu's door from the picket. Cantu then stepped out of his cell and began to walk with Waltersdorf toward the crash-gate leading to the recreation area. As this was happening, however, Hernandez was

---

[2]The appellants do not explain why Cantu was taken out of turn that day, but only offer up possibilities as to why any inmate might be taken out of turn.

escaping from his cell. Hernandez opened his cell door and then passed through the unlocked section gate. Jones claims that it was at this point that he first noticed Hernandez had escaped and called the main desk in administrative segregation for backup, and notified Simecek that Waltersdorf needed help.[3] Jones was unable to do anything more, however, as TDCJ-ID policy forbids the picket officer from leaving the picket for any reason, including a disturbance.

After passing through the section door, Hernandez went down the stairs toward Cantu and Waltersdorf. Hernandez then attacked Cantu from behind, knocking him down and then slashing his face and neck with a razor blade. Though correctional officers are forbidden by TDCJ-ID policy from getting involved in an inmate on inmate attack until other officers arrive on the scene, Waltersdorf claims that he grabbed Hernandez's wrist, but Hernandez jerked his hand away. Waltersdorf claims that it was at this point that he realized that Hernandez had a razor blade and so he stepped back with a food tray bar raised above his head. Waltersdorf claims that he then instructed Hernandez to get off of Cantu at which time he claims Hernandez ceased. Cantu's testimony does not confirm

---

[3]Though Jones testified that he did not notice that the door was unlocked, he authored a handwritten statement after the attack, stating that he noticed the door was unlocked but did not notify Waltersdorf of this fact. Appellants claim that this letter is not an admission of intentionally leaving the door unlocked, but that it merely admits that Jones could not get Waltersdorf's attention about the unsecured door.

Waltersdorf's version.  Cantu did not testify to seeing Waltersdorf attempting to help and claims that the only thing Waltersdorf said was, "Stop that, you are going to get us into trouble."  Cantu also testified that the attack did not cease until Simecek arrived.  Simecek testified that he was notified of the attack while escorting inmates to recreation in another area.  When he arrived at the crash-gate, he saw Waltersdorf holding an object that looked like a riot baton and yelling at Hernandez.  Simecek then went around the picket to get to Section C, and when he came into view of the attack he yelled "stop."  He testified that it was at this point that Hernandez stopped cutting Cantu and ran back into Section C, closing the door behind him.

After the attack, Cantu walked to the infirmary, where he required 52 stitches.  Captain Beaird had Cantu brought into his office the next day.  Cantu claims that Beaird asked him if he was feeling any better and then told him, "You know what?  I don't like a snitch.  Consider yourself lucky that you are still alive."  Cantu responded by stating that he wanted criminal charges filed against Hernandez and by warning Beaird that he was going to file a lawsuit.

A few months before the attack, Cantu began having problems with several correctional officers on the Connally Unit.  These officers worked a schedule known as card B.[4]  From December 25,

_____

[4]Officers Waltersdorf and Jones worked card A, which was a separate shift.  Apparently, card A and card B officers work on

7

1998, through January 1999, Cantu wrote twelve letters to various TDCJ-ID officials complaining that Officers Gomez, Nieto, Alvarado and Carnesalas, all card B officers, were mistreating him and threatening him. Three of the twelve letters were sent to Beaird, who was the captain in charge of administrative segregation, and who was, therefore, also in charge of the officers identified in Cantu's letters as well as Jones and Waltersdorf. In his letters, Cantu complained specifically that Officer Gomez had threatened to have him assaulted and that Cantu felt his life was in danger. Cantu also expressed concern that officers could let inmates out of their cells to attack him and that Officer Gomez was discussing Cantu with some members of the Mexican Mafia. Beaird testified that he did not recall ever seeing any letters from Cantu, but this is contested by Cantu's testimony that Beaird told him after the attack that he did not like a "snitch."

Cantu filed a civil rights lawsuit *pro se* on July 3, 2000, accusing Mathew Jones, John Beaird, Richard Waltersdorf, Gary Johnson, and TDCJ-ID of violating his constitutional right to be free from cruel and unusual punishment after he was attacked by another inmate with a razor blade. Cantu's appointed lawyer later added a claim for negligence. Cantu based his claim on the theory that the defendants allowed Carlos Hernandez to escape from his cell and attack Cantu. Defendants Beaird, Waltersdorf and Johnson

different days and are not at the prison at the same time.

8

denied Cantu's allegations and asserted the defense of qualified immunity on September 5, 2000. Jones answered and asserted qualified immunity on September 15, 2000.

TDCJ-ID filed a motion to dismiss on March 1, 2001, claiming that it was an improper party to a § 1983 lawsuit, and that it was immune from suit in federal court under the Eleventh Amendment. The trial court dismissed the § 1983 claim on March 13, 2001, and the negligence claim on March 29, 2001.

A jury trial began on July 3, 2001, and Cantu elected to proceed against only Jones, Waltersdorf and Beaird on his constitutional deliberate indifference claim. Cantu alleged that Beaird, after seeing Cantu's letters, conspired with Waltersdorf and Jones to allow an inmate to escape so that he would be attacked. The district court denied the defendants' motion for judgment as a matter of law at the close of Cantu's case and again at the end of the presentation of the evidence. The jury returned a verdict for Cantu, finding that the defendants had violated Cantu's constitutional rights and were not entitled to qualified immunity, and awarding Cantu $22,500 in compensatory damages. Final judgment was entered on July 17, 2001, and Jones, Waltersdorf and Beaird filed their renewed motion for judgment as a matter of law on July 26, 2001. The district court denied the renewed motion on August 8, 2001. Jones, Waltersdorf, and Beaird now appeal.

**DISCUSSION**

Did the district court err by not granting the appellants' motion for judgment as a matter of law in light of the evidence presented at trial?

The appellants contend that there is absolutely no evidence that any of them were aware of any risk of harm to Cantu until the attack began and that they acted reasonably at all times. Appellants point to the lack of any direct evidence that Jones, Waltersdorf or Beaird were aware of Cantu's letters as well as to the lack of any direct evidence that this was anything more than a colossal coincidence. Appellants claim that, at most, the proof could only show negligence, which is below the standard needed for deliberate indifference.

This Court conducts a *de novo* review of a district court's denial of a motion for judgment as a matter of law. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). In reviewing the motion, this Court should review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[I]f there is substantial evidence...of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[] should be denied." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled in part on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107

10

F.3d 331 (5th Cir. 1997) (en banc). However, a mere scintilla of evidence is insufficient to present a question for the jury. **Id.**

The Supreme Court has held that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. **Farmer v. Brennan**, 511 U.S. 825, 832 (1994). Specifically, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. **Id.** at 833. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." **Id.** at 847. In other words, the prison official must have a sufficiently culpable state of mind, which, in prison-conditions cases, is one of "deliberate indifference" to inmate health or safety. **Id.** at 834. To find that an official is deliberately indifferent, it must be proven that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." **Id.** at 837.

Though the present case involves an extraordinary set of circumstances, we do not believe that there was insufficient evidence on which the jury could base its decision. The jury was

11

offered more than a scintilla of evidence and was free to make credibility determinations based on that evidence.  The appellants claim that this case was nothing more than a colossal coincidence, however, the jury obviously disagreed.  We hold that the district court did not err in denying the appellants' motion.

<u>Did the district court err by not granting the Appellants' motion for judgment as a matter of law on the basis of qualified immunity?</u>

In reviewing a claim of qualified immunity, this Court must determine: "(1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident." ***Hare v. City of Corinth***, 135 F.3d 320, 325 (5th Cir. 1998).  The appellants do not contest that the constitutional right of offenders to be protected from harm was clearly established at the time of the attack.  The appellants do contest, however, the finding that they acted in an objectively unreasonable fashion.

All of the appellants' arguments on this point rely on the assumption that the appellants were never aware that the attack was going to happen and that they acted reasonably after the events started to unfold.  This argument ignores, however, that the claim against them involves deliberate indifference on their part.  The jury found that the appellants essentially orchestrated the attack.  This is in no way reasonable behavior for a prison official.  Therefore, we conclude that the resolution of the first issue in

12

this case is determinative and that the appellants are not entitled to qualified immunity.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the district court did not err in denying the appellants' motion for judgment as a matter of law and that the jury's verdict should remain undisturbed. We also conclude that the district court did not err in denying appellants' motion for judgment as a matter of law based on qualified immunity. We therefore AFFIRM the district court's decision.

**AFFIRMED.**