**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-6229**

_____

KIM M. STRICKLAND, Personal Representative and Administrator of the Estate of Aaron A. Cooper,

      Plaintiff - Appellant,

    v.

HEATHER HALSEY, Corrections and Floor Officer, Red Onion State Prison; TRACY GILMORE, Building Sergeant, Red Onion State Prison; BRIAN MEADE, Corrections Officer, Red Onion State Prison; ROBERT MULLINS, Corrections Officer, Red Onion State Prison; FIRST NAME UNKNOWN BALL, (Female) Corrections Officer, Control Booth, Red Onion State Prison; THREE UNKNOWN CORRECTIONAL OFFICERS,

      Defendants – Appellees,

    and

HAROLD W. CLARKE, Director, Virginia Department of Corrections; JOHN JABE, Director, Operations, Virginia Department of Corrections; JOHN S. GARMAN, Regional Director, Virginia Department of Corrections; TRACY RAY, Warden, Red Onion State Prison; RICHARD ROWETTE, Assistant Warden and Incident Commander, Red Onion State Prison; LESLIE FLEMING, Major, Chief of Security, Red Onion State Prison; TRAVIS MCCOY, Lieutenant, Shift and Watch Commander, Red Onion State Prison; TONY ADAMS, Sergeant, Instructional Investigator, Red Onion State Prison; JAMES BENTLEY, Intelligence Officer, Red Onion State Prison; J. RICK WIANDT, MSA, Investigator, Inspector General, Virginia Department of Corrections; L. FLEMING (male) Lieutenant, Red Onion State Prison,

      Defendants.

Appeal from the United States District Court for the Western District of Virginia, at Big Stone Gap.  James P. Jones, District Judge.  (2:12-cv-00019-JPJ-PMS)

Argued:  March 24, 2015                    Decided:  August 19, 2015

Before WYNN, FLOYD, and HARRIS, Circuit Judges.

Affirmed in part; reversed and remanded in part by unpublished per curiam opinion.

Mary Lynn Tate, TATE LAW, PC, Abingdon, Virginia, for Appellant. Henry Keuling-Stout, KEULING-STOUT, P.C., Big Stone Gap, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This lawsuit arises from the murder of an inmate, Aaron Cooper, by another inmate, Robert Gleason, at a maximum security prison in Virginia. Kim Strickland, the personal representative and administrator of Cooper's estate, brought suit under 42 U.S.C. § 1983, alleging that a sergeant (Tracy Baird) and three corrections officers (Heather Halsey, Brian Meade, and Robert Mullins) violated the Eighth Amendment by being deliberately indifferent to Cooper's safety. In support, Strickland asserts that the defendants took no measures to prevent Cooper's murder, despite knowing that Gleason had killed another inmate and that he threatened to kill again. She also asserts that the defendants actively facilitated Cooper's murder by, among other things, agreeing not to search Gleason for the murder weapon in exchange for Gleason providing them certain favors.

On appeal, we must decide whether the district court correctly held that qualified immunity protects the defendants from Strickland's § 1983 claim. For the reasons set forth below, we agree that Baird and Halsey are entitled to qualified immunity. On the other hand, disputed issues of material fact exist as to Meade's and Mullin's involvement in the murder. Accordingly, we affirm as to Baird and Halsey, and reverse and remand as to Meade and Mullins.

I.

Robert C. Gleason Jr. first entered prison in 2007 after receiving a life sentence for murder.[1] While serving his sentence at Wallens Ridge State Prison, Gleason strangled his cellmate, Harvey Watson Jr., to death. During a court appearance for Watson's murder, Gleason declared that he would kill again if he were not executed. According to a Red Onion sergeant present in the courtroom at the time, Gleason said, "it might be one of these guys next time" and pointed to several prison officers present in the courtroom. J.A. 66-67. Despite this outburst, Gleason was not sentenced to death. Instead, he was transferred to Red Onion State Prison (Red Onion), a Security Level S facility housing Virginia's most violent and dangerous inmates.

After arriving at Red Onion, Gleason set about making good on this threat to kill again. As his target, he settled on Aaron Cooper, a 26-year-old inmate serving a sentence of approximately 34 years for a series of robberies and

---

[1] In reviewing de novo the district court's order granting summary judgment to the Defendants, we "view the facts and all justifiable inferences arising therefrom in the light most favorable to" Strickland, as the nonmoving party. Libertarian Party of Va. v. Judd, 718 F.3d 308, 312 (4th Cir. 2013). The following statement of facts conforms to this standard.

carjackings.[2] Gleason testified that he befriended Cooper in order to gain his trust. Gleason then convinced Cooper to go along with a plan in which Cooper would fake being strangled by Gleason in order to bring suit against the prison. Gleason testified that he told Cooper, "I want you to take a deep breath so you can pass out so if they do a polygraph test on you if they ask you did you actually pass out from Mr. Gleason choking, pulling on the rope." J.A. 97. But, according to Gleason, "I made that up. That was never going to happen. That was never going to happen. I was going to kill him." J.A. 88. Gleason wanted to make the Department of Corrections look stupid because "they kept on saying this is Red Onion, this ain't going to happen up here." J.A. 102. With the help of other prisoners, Gleason obtained his weapon, a long rope "braided so that way it wouldn't break" while in the showers. J.A. 89.

After obtaining the rope, Gleason still needed to find a way to get close enough to Cooper to use it, no easy feat in Red Onion, where the prisoners are separated in individual metal cages even during outdoor recreation time. Gleason took

---

[2] Cooper had been transferred to Red Onion because he set fire to objects at least twice in order to escape gang violence at his previous prison. Cooper's behavior at Red Onion seems to have been the motivating factor in drawing Gleason's attention. J.A. 106 (Gleason targeted Cooper because he "messed up and started running his mouth" and told "lies.").

advantage of a widespread system of favor-trading between guards and inmates in order to get close to Cooper. Gleason says that he made arrangements with Halsey, Meade and Mullins to effectuate his plan. According to Gleason, prisoners would often arrange to stay inside their cells during recreation time in exchange for other favors from guards. Guards participated in this exchange because they were saved the work of bringing the prisoner onto the recreation yard. To execute his plan to kill Cooper, Gleason says that he arranged with Halsey and Meade to assign prisoners to the metal cages in the recreation yard so that Cooper's and Gleason's cages would be adjacent. J.A. 91 ("Well, I told [Meade] I'd stay in plus other things, and I don't want to get into that."). According to both Meade and Mullins, inmates usually chose their own cages. J.A. 230-31 ("They usually just choose their own cage. . . . We'd just take them to whichever case they went to."); J.A. 245 ("They chose. When they come out, they went to the rec, the cage that they just walked out and went to the cage that they wanted to go into."). Halsey and Meade deny an agreement with Gleason regarding the placement of inmates on that day.

After securing a place next to Cooper in the recreation yard, Gleason still had to get the rope into the cage. Again, Gleason testified that he had help in doing so. Before inmates are brought onto the recreation yard, they are strip-searched by

6

the officers. On the day of the killing, Meade and Mullins searched Gleason (Halsey was elsewhere at the time). Although Gleason had the rope in his shirt during the search, Meade and Mullins did not find it. J.A. 93. Gleason claims that Meade and Mullins purposefully performed an insufficient search because of an agreement to provide them with favors. Gleason also testified that his plan to kill Cooper was common knowledge among the inmates. J.A. 94 (the inmates "all knew what was going on."); see also J.A. 97 ("All of [the inmates] except for Sparrow"). He also says that the prison officials "all knew what was going on. And plus Martin [Rodgers] gave them all a heads-up."[3]  J.A. 94. Meade and Mullins in turn deny any agreement with Gleason or that they performed an improper search.

Gleason also testified that Halsey deliberately looked the other way during the killing itself. According to Gleason,

---

[3] An affidavit by Tony Adams, a sergeant at Red Onion, states that Rodgers "made a statement to us that there were going to be problems on the recreation yard. He did not elaborate on the date, time or parties that would be involved and gave no details or specifics about what he knew or how he knew this." J.A. 66. Other affidavits support Adams's statement that Rodgers did not provide any actionable information. See J.A. 69 ("Rodgers provided no specific, exact or detailed information to staff about anything that was going to happen on the recreation yard or in any other location."); J.A. 72 ("Rodgers was not specific and refused to give details").

Halsey was in the control tower overlooking the yard in the moments before he strangled Cooper. Gleason also testified that Halsey saw him place the rope around Cooper's neck. J.A. 118. Then, according to Gleason, "She looked down, that's when they all looked up, were inside talking and what not, and I pulled the rope up and that's when she shut window and never seen her again." J.A. 118. Halsey, however, denies this account, and instead says she was in another part of the prison during the killing.[4] According to Travis McCoy, the Warden of Red Onion at the time, "staffing policy did not require security staff be present on the recreation yard during offender recreation." J.A. 76.

Video evidence shows that Gleason strangled Cooper, walked away, and then strangled him again. When Halsey went to the yard to bring the inmates back to their cells, she found Cooper's body and radioed Baird, a sergeant at the prison, for assistance. Although medical assistance was administered, it was too late: Cooper died at the scene.[5] The Virginia

---

[4] It is undisputed that neither Mullins nor Meade where near the yard when the killing happened.

[5] Gleason was put to death by electrocution on January 16, 2013. Justin Jouvenal, Va. Executes Convicted Killer Who Sought Death Penalty, Washington Post, Jan. 16, 2013, www.washingtonpost.com/local/va-executes-convicted-killer-who-sought-death-penalty/2013/01/16/89802e00-6015-11e2-9940-6fc488f3fecd_story.html.

Department of Corrections later disciplined all of the Defendants for their roles in Cooper's death.

Acting as personal representative and administrator of Cooper's estate, Kim Strickland brought this action under 42 U.S.C. § 1983, alleging that Defendants violated the Eighth Amendment of the U.S. Constitution.[6] The district court granted summary judgment for Defendants on the basis of qualified immunity. Specifically, the district court found that none of the four Defendants violated the Eighth Amendment because they were not deliberately indifferent to a "substantial risk of serious harm" to Cooper. Farmer v. Brennan, 511 U.S. 825, 834 (1970). This appeal followed.

## II.

"Whether a party is entitled to summary judgment is a question of law we review de novo using the same standard applied by the district court." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled

---

[6] Strickland originally brought two additional counts, which are not on appeal here: Count II, a supervisory liability claim, and Count III, a civil conspiracy claim.

to judgment as a matter of law.'" Id. (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)). Thus, in this case, we view the facts in the light most favorable to Strickland.

At the center of this appeal is the district court's grant of qualified immunity to all of the Defendants. Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Put differently, qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Consequently, a defendant is entitled to qualified immunity in a § 1983 case if (1) his or her conduct did not violate the constitutional right at issue or (2) the right was not "clearly established" at the time of the incident. Pearson, 555 U.S. at 232, 236. Succeeding on either prong is sufficient for entitlement to qualified immunity, and courts may begin with either prong. Id. at 234.

10

As set forth below, we agree that Baird and Halsey did not violate the Eighth Amendment because they did not take any action or inaction such that a reasonable factfinder could find that they were deliberately indifferent. We conclude that a reasonable factfinder could determine, drawing all reasonable inferences in Strickland's favor, however, that Meade and Mullins exhibited such indifference. We also conclude that Cooper's Eighth Amendment right in this instance was clearly established. Accordingly, we will reverse the district court's grant of qualified immunity as to Meade and Mullins, but affirm as to Baird and Halsey.

### III.

We begin with the first prong of qualified immunity: whether the Defendants violated Cooper's Eighth Amendment constitutional rights. The Eighth Amendment requires prison officials to "protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833. Officials must take "reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984). In other words, "[t]he government and its officials are not free to let the state of nature take its course." Farmer, 511 U.S. at 833. "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a

11

heavy one." Pyles v. Fahim, 771 F.3d 403, 408-09 (7th Cir. 2014) (citing Whitley v. Albers, 475 U.S. 312, 325 (1986)).

Not every "injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. Instead, the Supreme Court has outlined two requirements for an Eighth Amendment failure to protect claim. First, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). In other words, the denial of the prisoner's constitutional rights must be "sufficiently serious." Id. Second, the prison official must have a "sufficiently culpable state of mind," id., which means the official either purposefully caused the harm or acted with "deliberate indifference," Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).

The first requirement is easily satisfied here. Cooper was murdered by another prisoner. The deprivation of his constitutional rights is unquestionably "sufficiently serious."

Whether prison officials acted with "deliberate indifference" for purposes of the second requirement presents a closer call. In the Eighth Amendment context, deliberate indifference "lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in

12

criminal law." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995). For a prison official to be liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. The test is subjective, not objective. Brice, 58 F.3d at 105. A prison official is not liable if he or she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 844; see also Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997) (finding that a prison official was not liable, because he did not actually draw the inference that the inmate was exposed to a substantial risk of serious harm).

This case, therefore, hinges on whether any of the Defendants were subjectively aware of the risk of harm to Cooper, shown either through direct evidence or circumstantial evidence of actual knowledge.[7] Makdessi v. Fields, __ F.3d __, No. 13-7606, 2015 WL 1062747, at *5-6 (4th Cir. 2015).

---

[7] A court can use circumstantial evidence to infer that an official "must have known" of the risk based on "the very fact that the risk was obvious." Farmer, 511 U.S. at 842. "In other words, although the obviousness of a particular injury is not conclusive of an official's awareness of the injury, an injury might be so obvious that the factfinder could conclude that the guard did know of it because he could not have failed to know of it." Brice, 58 F.3d at 105 (citation omitted).

13

Strickland claims the defendants were subjectively aware of the risk to Cooper because: (i) they knew that Gleason had killed in the past and that he threated to kill again; and (ii) they facilitated the murder by, inter alia, failing to properly strip-search Gleason and recover the murder weapon. As explained below, we disagree that mere knowledge of Gleason's threats rises to the level of deliberate indifference. On the other hand, taking the facts in the light most favorable to Strickland, we conclude that failing to adequately strip-search Gleason for the murder weapon, pursuant to a pre-arranged agreement, does constitute deliberate indifference. Because Meade and Mullins were responsible for conducting the search, we reverse as to them only.

1.

We start with Gleason's criminal history and his declared intent to kill again. Strickland argues that Defendants should have taken more precautions given Gleason's past murder of another inmate. The parties dispute whether the defendants were actually aware of Gleason's criminal past and the reason for his transfer to Red Onion.[8] Whether the Defendants knew about

---

[8] Before the district court, Strickland's counsel conceded that Mullins, Meade, and Halsey were not formally notified of Gleason's declaration that he would kill again. J.A. 160 (Continued)

14

Gleason's' past threats is ultimately not dispositive, however. The relevant question is whether the Defendants <u>subjectively believed</u> Gleason posed a substantial risk of serious harm to other inmates, not whether they simply knew he had previously stated he would kill again. See <u>Farmer</u>, 511 U.S. at 837 (noting that to hold an official liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). In other words, there is no evidence that any of the Defendants drew the inference that Gleason posed a risk to other inmates due to his criminal history.

_____

(Halsey); 172S, 172T ("[T]hey weren't notified in any specific way of his promise to kill again . . . ."). Only Baird was briefed about Gleason's murder of Watson. In contrast, Meade, Mullins, and Halsey testified that they discovered Gleason's past through rumor. See J.A. 284 (Mullins) ("I'd asked somebody, you know, what he had done, and they told me about the Wallens Ridge incident."); J.A. 227 (Meade) ("Just hearsay. I don't know if it was true. But an incident that occurred at another facility.").

Gleason also testified that Defendants were (at least informally) aware of his criminal past and declaration to kill again. J.A. 85 ("In fact up front they were telling COs to look at it on the Internet. So each one that came by they asked me about it and I said yeah, I said that. Everybody knew that."). In other words, although Meade, Mullins, and Halsey were not formally told by any prison official to be especially careful with Gleason, they had at least some reason to believe Gleason intended to kill again.

15

Here, the undisputed testimony shows that the Defendants simply did not believe that Gleason was capable of acting on his threats. Instead, they believed Red Onion's maximum security procedures would thwart any efforts to kill again. See J.A. 83 ("And I was like well, you heard what I said in court. He said this is Red Onion, this doesn't happen up here." (Gleason commenting referring to Tracy Ray, the Warden at Red Onion)); J.A. 102 ("Well, Tracy Ray, the Major, and a lot of the staff said no one has ever been killed in segregation—first they said nobody's ever been killed at Red Onion."). Gleason instead sought to make the Department of Corrections look "stupid" because his threats were not being taken seriously. J.A. 102-03. Instead, Defendants regarded Gleason as (to the extent a twice-convicted killer can be) pleasant and respectful. See J.A. 151 (Halsey) (stating that Gleason was "talkative and friendly" most of the time and "nice[] and respectful[]); J.A. 227 (Meade) (stating he "[n]ever had any issues with" Gleason).

Regardless of whether the Defendants were aware of Gleason's threats then, they did not subjectively infer that Gleason posed a substantial risk of serious harm. Accordingly, prong one fails to the extent it is based solely on Gleason's past threats.

Although the Defendants' awareness of Gleason's criminal history did not demonstrate deliberate indifference, Gleason also describes a network of favor-trading between guards and inmates at Red Onion that facilitated the circumstances of his murder of Cooper. Specifically, Gleason states that there were two discrete instances of favor-trading that facilitating his murder of Cooper: (1) arranging with Meade and Halsey the placement of inmates on the recreation yard such that Gleason was next to Cooper, and (2) agreeing with Meade and Mullins to be insufficiently searched prior to entering the recreation yard so that he could keep the braided rope on his person. Only the second instance of favor-trading, with Meade and Mullins, rises to the level of deliberate indifference.

Regarding the first instance of favor-trading, Gleason says that he arranged with Halsey and Meade to ensure that he was put next to Cooper on the recreation yard. At the time of this case's events at Red Onion, inmates were permitted by the guards to select their own cages while on the recreation yard.[9] Although Red Onion officials stated in affidavits that inmates

---

[9] An affidavit by the warden states that prison guards are not permitted to engage in favor-trading with inmates. J.A. 55-56 ("'Trading' and/or doing favors for offenders is against VDOC policy and is not condoned or tolerated."); J.A. 58 (affidavit of assistant warden).

are to be placed in cages randomly, that policy, viewing the evidence in the light most favorable to Strickland, was widely ignored. See J.A. 63, 76. Gleason seeking to be next to Cooper, then, was not a particularly notable event at Red Onion. Strickland presents no evidence that Halsey or Meade were aware that Gleason's desire to be next to Cooper posed a substantial risk of serious harm to Cooper. Indeed, the guards regarded the cage selection as a normal activity in prison life. Consequently, Halsey and Meade were not deliberately indifferent by allowing Gleason to select cages.

Second, according to Gleason, Meade and Mullins then granted Gleason a much more unusual favor: the right not to be thoroughly searched prior to entering the yard as required by prison policy. See J.A. 62 ("It is policy that all offenders are strip searched when leaving their cells for any reason . . . ."). Unlike the cage selection policy, there is no evidence in the record that the strip-search policy was widely ignored by the guards.

Of course, a merely negligent or careless strip search would not result in liability under the deliberate indifference standard articulated in Farmer. But Gleason states that Meade and Mullins entered into an agreement to avoid a thorough search, an important safety regulation for inmate safety at the

18

prison.[10]     As part of that agreement, they failed to search Gleason's long-sleeved shirt, which concealed the braided rope.

Deliberate indifference can be found if the official "declined to confirm inferences of risk that he strongly suspected to exist." Farmer, 511 U.S. at 843 n.8. And as we stated in Makdessi, "prison officials may not simply bury their heads in the sand and thereby skirt liability." 2015 WL 1062747, at *6. Under this standard, Meade and Mullins need not have known that there was a certain risk of harm to Cooper or other inmates, of course, only that there was a "substantial risk of serious harm." Farmer, 511 U.S. at 834. We conclude that they would have had reason to know of such risk here. Surely Meade and Mullins suspected that Gleason wished to avoid a search in order to bring contraband into the yard – why else would he want to avoid a search? And even if Meade and Mullins were not aware of the precise nature of the contraband (i.e., a rope), absolute certainty of danger is not required – only knowledge of "substantial risk" is. Farmer, 511 U.S. at 834. Certainly permitting an inmate to bring an object of some kind onto the yard presented such a risk. Thus, a reasonable

---

[10] The record contains ample evidence regarding the importance of this policy. See J.A. 191 (policy was enacted to prevent inmates from throwing feces, weapons, and other objects from cage to cage).

factfinder could conclude that Meade and Mullins must have subjectively known that there was a substantial risk of serious harm to Cooper or other inmates.[11]

3.

Unlike Meade and Mullins, Halsey and Baird did not participate in the inadequate search of Gleason before he entered the yard. Indeed, the only evidence supporting Strickland's claims against Baird is her claim that Baird knew about Gleason's criminal history and threats to kill again. As we have held above, mere knowledge of those threats does not constitute deliberate indifference. Consequently, the district court correctly granted summary judgment to Baird on the basis of qualified immunity.

The district court also correctly held that Halsey is entitled to qualified immunity. Strickland's primary allegation

_____

[11] In order to find liability, Meade and Mullins need not be aware of a specific risk to Cooper when allowing Gleason to bring an object onto the yard. Farmer, 511 U.S. at 843 (stating that if officials are aware of a risk of inmate violence, "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom"). To meet the deliberate indifference standard, moreover, Meade and Mullins did not have to enter into an agreement for the purpose of harming Cooper. As the Supreme Court has noted, deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835.

against Halsey is that she saw Gleason with the rope from a control room above the prison, yet did nothing to stop him.[12] Gleason testified that Halsey saw Gleason holding the rope. J.A. 118 ("[B]ecause when she opened up that window I had it in my hands. She could see it clear as day."). Then, according to Gleason, "[s]he looked down, that's when they all looked up, were inside talking and what not, and I pulled the rope up and that's when she shut window and never seen her again." J.A. 118. Halsey denies seeing the rope or being in the control room at all during the events that led to Cooper's murder.

Although we must credit Gleason's testimony and make all reasonable inferences in Strickland's favor, Gleason's statements about Halsey amount to mere speculation. A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Here, Gleason merely speculates that Halsey saw the rope on the recreation yard. Of course, Gleason cannot know for sure what Halsey saw. Strickland offers no other evidence supporting her

---

[12] Tracy Ray, the Warden of Red Onion at the time, states that although there is a control room overlooking this part of the prison, there "is no 'video room' at Red Onion for purposes of observing offenders on the recreation yard. The Intel Office has access to live and recorded video footage; however, no staff person is posted to monitor live videos." J.A. 55; see also J.A. 58 (similar statement by assistant warden at Red Onion).

claims about Halsey's activities on the recreation yard. By contrast, as to Meade and Mullins, as discussed above, Gleason stated personal knowledge of an explicit agreement with them for an insufficient search.

"Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). Because Strickland offers no other evidence about Halsey's activities on the recreation yard other than Gleason's speculative testimony, we will affirm the district court's grant of qualified immunity as to Halsey.

IV.

Having concluded that only Meade and Mullins violated the Eighth Amendment, those two defendants "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Saucier v. Katz, 536 U.S. 730, 739 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).[13] Consequently, we must determine

---

[13] The district court did not reach question because it decided that Meade and Mullins did not violate Cooper's constitutional rights at all.

22

whether Cooper's Eighth Amendment rights were "clearly established" at the time of his murder.

"[C]onduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011) (quotation omitted). But the court need not determine that the "very action in question has previously been held unlawful." Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 176 (4th Cir. 2010) (citation omitted). Indeed, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." United States v. Lanier, 520 U.S. 259, 271 (1997).

That is the case here. Farmer applies with "obvious clarity": the case clearly establishes that the Eighth Amendment protects prisoners from violence perpetrated by other inmates. See Price v. Sasser, 65 F.3d 342, 346 (4th Cir. 1995) (stating that "the law governing failure to protect [inmates] . . . was unclear in some important respects" prior to Farmer). Other circuits similarly agree that Farmer, and similar cases, clearly established that the Eighth Amendment is violated when an inmate

23

commits violence against another inmate. See, e.g., Cantu v. Jones, 293 F.3d 839, 845 (5th Cir. 2002) ("[T]he constitutional right of offenders to be protected from harm was clearly established at the time of the attack."); Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (inmate "had a clearly established constitutional right to have prison officials protect him from inmate violence."); Curry v. Crist, 226 F. 3d 974, 977 (8th Cir. 2000) ("Prison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates.").

Here, a reasonable officer would know that intentionally violating prison policy by failing to strip-search an inmate, pursuant to an agreement with that inmate, would put other inmates at a substantial risk of serious harm. Consequently, we reverse the district court's grant of qualified immunity as to Meade and Mullins and remand for further proceedings.

V.

For the foregoing reasons, the district court's order granting summary judgment to Defendants is

AFFIRMED IN PART;
REVERSED AND REMANDED IN PART.

24